727 So.2d 647 (1999)
Terri DAVIS, et al.
v.
AMERICAN HOME PRODUCTS CORPORATION.
No. 98-C-2160.
Court of Appeal of Louisiana, Fourth Circuit.
January 15, 1999.
*648 Darleen M. Jacobs, St. New Orleans, and J. Robert Ates, Destrahan, and Wendell H. Gauthier, Gauthier, Downing, Labarre, Beiser & Dean, Metairie, and Stephen B. Murray, Jr., Linda S. Harang, Murray Law Firm, New Orleans, and Robert G. Harvey, Harvey, Jacobson & Corrington, New Orleans, and Terrill W. Boykin, Stephen J. Moore, Rodney, Bordenave, Boykin, Bennette & Boyle, New Orleans, Attorneys for Relator.
Henri Wolbrette, III, Kathleen A. Manning, McGlinchey Stafford Lang, New Orleans, Attorneys for Respondent.
Court composed of Chief Judge DENIS A. BARRY, Judge STEVEN R. PLOTKIN, Judge MIRIAM G. WALTZER, Judge MOON LANDRIEU, Judge JAMES F. McKAY, III.
LANDRIEU, Judge.
This application for supervisory writs presents an issue relative to pretrial discovery of the underlying basis of an expert witness's opinion. Plaintiffs seek supervisory review of a trial court judgment compelling the production of medical records concerning patients whose treatment underlies the report presented by the plaintiffs' expert witness. We grant plaintiffs' application for supervisory writs and reverse the judgment of the trial court.

FACTS
The underlying suit is a products liability case brought by women allegedly injured by using the Norplant contraception system. The plaintiffs seek to maintain the litigation as a class action. In preparation for the certification and hearing in compliance with a case management order, the plaintiffs and the defendant, American Home Products Corporation, exchanged expert reports in January of 1998. The plaintiffs submitted a report from Dr. Andrew Campbell, the medical director of the Center for Immune, Environmental and Toxic Disorders, located in Houston, Texas. In the report, Dr. Campbell stated, in pertinent part, as follows:
At our Center, we have evaluated young women of all ages, from late teens to midthirties, with stroke, blindness, paraplegia, hemiplegia, medically serious and dangerous weight gain, pregnancy, severe scarring of the upper arm, all due to Norplant
. . . .
It is therefore my opinion, based upon these facts, that Norplant is unreasonably dangerous to women in design, construction, composition, drug delivery system and provides inadequate warnings.
My opinions stated above are based on the information available to me at this time. I reserve the right to amend my opinions, as more information becomes available.
*649 Upon receipt of Dr. Campbell's report, American Home requested copies of all of Dr. Campbell's medical records on Norplant patients. Because none of Dr. Campbell's patients were members of the putative class and because Dr. Campbell's report was not based upon review of any specific records, the plaintiffs objected to American Home's request.
In its Motion to Compel, American Home based its right to review the records of Dr. Campbell's patients upon the explicit language of the case management order, and the reasoning and holding of an unpublished opinion improperly cited to this court. American Home relies upon the following language in the case management order:
Each expert report shall be signed by the expert witness, shall contain a complete statement of all opinions to be expressed at the hearing, including the bases and reasons for the opinions, the data or other information considered by the witness in forming the opinions.
American Home argues that Dr. Campbell's expert opinion was based partly on the experience of the women seen at the Center. Thus, these women's experiences constituted both "the bases and reasons for [the expert's] opinions" and "the data or other information considered by the witness in forming the opinions." Inclusion by Dr. Campbell of information concerning the complaints of women seen at the clinic to reach the ultimate conclusion that Norplant is unreasonably dangerous, according to American Home, requires the plaintiffs to provide medical information concerning these women to allow for effective cross-examination of Dr. Campbell. The special master agreed with American Home and ordered both sides to produce their Norplant patient records with all personal, identifying patient information redacted.
By Acts 1995, No. 1250, the legislature established a comprehensive scheme governing the issuance of orders or subpoenas duces tecum for the production of medical records and matters relating to the health care provider-patient privilege, through the amendments of La. Civ.Code Proc. art. 1469.1, La.Rev.Stat. 13:3715.1 and La.Code Evid. art. 510.
La.Code Civ. Proc. art. 1469.1, as amended and rewritten by Acts 1995, No. 1250, § 1, states:
No order, subpoena, or subpoena duces tecum for the purpose of obtaining or compelling the production or inspection of medical, hospital, or other records relating to a person's medical treatment, history, or condition, including a subpoena or order issued under Article 1463 and including a subpoena compelling the attendance of the custodian of records or other employee of the health care provider, either by name, title, or position, in connection with such production, shall be granted or issued except as provided in R.S. 13:3715.1
La.Rev.Stat. 13:3715.1(B), as amended by Acts 1995, No. 1250, § 2, provides in pertinent part:
B. The exclusive method by which medical, hospital, or other records relating to a person's medical treatment, history, or condition may be obtained or disclosed by a health care provider, shall be pursuant to and in accordance with the provisions of R.S. 40:1299.96 or Code of Evidence Article 510, or a lawful subpoena or court order obtained in the following manner:
* * * * * *
(2) Any attorney requesting medical records of a patient, who is not a party to the litigation in which the records are being sought may obtain the records by written authorization of the patient whose records are being sought or if no such authorization is given, by court order, as provided in Paragraph (5) hereof.
* * * * * *
(5) A court shall issue an order for the production and disclosure of a patient's records regardless of whether the patient is a party to the litigation, only: after a contradictory hearing with the patient, or, if represented, with his counsel of record, or, if deceased, with those persons identified in Paragraph (3) hereof, and after a finding by the court that the release of the requested information is proper; or with consent of the patient.
*650 The health care provider-patient privilege is governed by La.Code Evid. art. 510, which provides in relevant part:
B. (1) General rule of privilege in civil proceedings. In a non-criminal proceeding, a patient has a privilege to refuse to disclose and to prevent another person from disclosing a confidential communication made for the purpose of advice, diagnosis or treatment of his health condition between or among himself or his representative, his health care provider, or their representatives.
Under La.Code Evid. art. 510, and, by reference, La.Rev.Stat. 13:3734(A), Dr. Campbell and the Center for Immune, Environmental and Toxic Disorders are health care providers. Pursuant to La.Code Evid. art. 510(B)(1), a patient has a privilege to refuse to disclose or prevent another from disclosing a confidential communication between or among a patient or his representative, his health care provider or their representative. La.Code Evid. art. 510(D) provides that the patient can claim the privilege. Additionally, the patient's physician or health care provider at the time the communication was made is presumed to have authority to claim the privilege on behalf of the patient. La.Code Evid. art. 510(B)(2) provides for exceptions to the general rule of privilege, none of which applies to the facts of the instant case.
In this case, none of the non-party patients gave written authorizations. Further, the mandatory procedure set out in La. R.S. 13:3715.1(B)(5) was not followed. There was no contradictory hearing with the non-party patients, their counsel, any of their survivors, or the executors or administrators of their estates.
American Home argues that the confidentiality of the physician-patient relationship would neither be subverted nor impinged upon by the court's order because the trial court directed that all patient identifying information be redacted prior to production of the records. According to the defendant, after redaction, the records would become anonymous case histories just as those described in medical journals or discussed in medical school classrooms. Disclosure of these anonymous records, according to the defendant, could not reasonably be viewed as chilling to the doctor-patient relationship.
While this argument appears convincing, there is no authority for the proposition that medical records become exempt from the mandatory requirements of La.Code Civ. Proc. art. 1469.1 and La.Rev.Stat. 13:3715.1 by the redaction or removal of "patient information."
Furthermore, La.Code Civ. Proc. arts. 1422-1425 permit discovery "regarding any matter not privileged, which is relevant to the subject matter of the action." Hodges v. Southern Farm Bureau Casualty Ins. Co., 433 So.2d 125, 129 (La.1983). The information being sought is privileged and/or confidential. Absent the existence of a statutory exception, permission from the non-party patients, or a contradictory hearing, the medical records of non-party patients are not discoverable in Louisiana.
Accordingly, for the above reasons, plaintiffs' application for supervisory writs is granted and the judgment of the trial court is reversed.
WRIT APPLICATION GRANTED; JUDGMENT REVERSED.
PLOTKIN, J., dissents with written reasons.
PLOTKIN, J., dissenting with written reasons.
This supervisory writ application raises an issue relative to pretrial discovery of a proposed expert witness's scientific methodology. Specifically, this court must answer the following question: May a party, during the pretrial phase, discover underlying medical data that forms the basis of an expert witness's scientific opinion. Like the special master and trial judge, I am convinced that the majority decision denying the discovery request is wrong on the basis of two major legal principles, namely that both federal jurisprudence and Louisiana statutory authority and jurisprudence permit discovery of the medical data, after redaction of the patient's personal identity.
*651 The special master and trial court ordered experts for both sides to produce their Norplant patient records after eliminating by redaction all personal patient identification. Dr. Campbell is the plaintiffs' proposed expert witness in this class action litigation. The defendant, American Home, requested all of Dr. Campbell's medical records involving women between the late teens to midthirties who used Norplant, on which his conclusions were based. All of the women in the study were non-parties, non-Louisiana residents, and non-members of the putative class. The record indicates, as the majority notes, that Dr. Campbell was unclear concerning the specific medical records he reviewed in forming his opinion. Thus, Dr. Campbell's expert witness report fails to state significant scientific information. It omits information concerning the following issues: how the experiment was designed; what method or material was chosen; what research structure and procedures were utilized; the method of statistical analysis, if any; and specific information about the medical data base.

I. Daubert/Foret requirements
In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the U.S. Supreme Court established the criteria for the admissibility of expert testimony in general and expert scientific testimony in particular. The Louisiana Supreme Court adopted Daubert, in State v. Foret, 628 So.2d 1116 (La.1993), mandating state courts to follow the same standards established by Daubert for federal courts.
The purpose of the Daubert/Foretrule is to prevent scientific fraud on society and the legal system. To accomplish this goal the courts have assigned a gate-keeping role to trial judges, requiring them to make a decision on the expert testimony. In Louisiana, that assessment occurs in a pretrial evidentiary hearing. See McMahon v. Regional Transit Authority, 96-1770 (La.App. 4 Cir. 12/10/97), 704 So.2d 392. See also Huber & Foster, "Science in the Court," Civil Justice Memo 33 (September 1997). At the hearing, the judge must assess four aspects of expert testimony: (1) the qualifications of the expert, (2) the reliability of the expert testimony, (3) the "helpfulness" of the testimony to the trier of fact, and (4) the prejudicial effect of the testimony. When the expert testimony offered is scientific in nature, Daubert decrees the several factors to be considered to guide the court in determining the second requirementreliability, the issue in this case.
When judging the reliability of scientific evidence, the trial court, pursuant to Daubert, must determine the following questions: (1) whether the theory or technique can be (or has been) tested, (2) if it is "falsifi(able)," (3) been subject to "peer review," (4) the "known or potential rate of error of a scientific technique," (5) the "existence and maintenance of standards controlling the techniques operation," (6) "general acceptance" within the scientific community, and (7) "the inquiry is a flexible one, and its focus must be solely on the principles and methodology, not on the conclusions that they generate." Daubert, 113 S.Ct. at 2796-97.
Without the information requested in the instant case, it is impossible for the trial judge to determine whether to admit or deny the expert scientific testimony, under Daubert /Foret. How are the parties, lawyers, and judge going to gauge the reliability and validity of the proposed scientific expert's testimony? First, the trial judge must determine the admissibility of evidence under La. C.C.P. art. 104(A), applying the standards of La. C.E. arts. 702 and 703. This requires an evidentiary hearing where inquiry is made into the qualifications of the expert, the reliability of his testimony, the helpfulness of the proposed testimony and the prejudicial effect. Second, when the issue is reliability or validity of expert scientific evidence, the inquiry includes the factors listed above in Daubert/Foret. See McMahon, 704 So.2d 392.
In this case, the defendant's request for protection of anonymous medical records is for the purpose of preparing for a preliminary admissibility hearing. Applying the criteria for reliability or validity to this case, the first test is whether the theory or technique can be (or has been) tested, whether the test, study, calculation or observation at *652 issue can be related, by a credible theory, to the issue in dispute. The question focuses how much other evidence exists and how consistently the totality of the evidence proffered supports a theory explaining what is occurring. The question of relevance or fit requires judges to survey the sum total of scientific evidence that bears on the proposition in dispute. Thus, a judge must determine how each expert's testimony fits into the context of what is known about the subject.
The second criterionfalsifiabilitymeans that a scientific premise must be stated in a manner that permits it to be falsified by other scientists if it is incorrect. This criterion is intended to prevent the misuse of expert testimony when the principle advanced cannot be tested or confirmed by other experts.
The third testsubject to peer review considers whether the postulate has been reviewed, examined or criticized by accepted and respected journals and scientists. The documents filed relative to this application for supervisory writs are devoid of any evidence that Dr. Campbell has ever published his data or conclusions. Thus, his opinions have not been subject to peer review.
The fourth factorerror raterelates to scientific error. Errors in a scientific project can occur in many different ways. One obvious error is misinterpretation of the original research data. However, this issue is generally determined by normative standards of review by scientists that apply to the theory advanced. Thus, in order to determine if any error rate exists, it is necessary for other examiners to review the basis data and techniques applied.
The fifth criterionthe existence and maintenance of standards controlling the technique's operationrefers to the type of research structure created and utilized. There are four different types of research structures to determine and test an etiologic hypothesis. They are as follows: (1) experimental trial, (2) observational cohort, (3) retrospective case-control (Trohoc), and (4) general population association. Feinstein, Alvin R., DR, Clinical Biostatistics Clinical Pharmacology Therapy, April 79.[1] Dr. Campbell's report does not identify the type of research structure he maintained, his hypothesis, the number of patients in the study, any medical information or history, or any specific diagnosis of illness of the patients.
The sixth determinant is general acceptance in the scientific community, which is read in pari materia with peer review. Science has the ability to examine and evaluate what is or is not generally accepted, ranging from the correct procedures for conducting research to the validity of the results. Respected public and private scientific council institutes, medical societies, academies, and foundations provide the basis for general acceptance and peer review.
The last criteriona flexible investigation into the principles and methodologyare particularly instructive. This factor is intended to test whether the scientific evidence is based on scientific validity and is therefore reliable. Reliability depends upon the trustworthiness and the correctness of the observer. The former questions the expert's personal reliability and interpreter of science, while the latter challenges whether the observer has the required knowledge, data, and individual competence to assess properly the external information. Scientific validity is the ultimate question to be decided for admissibility. Daubert, 113 S.Ct. at 2797. It is axiomatic that the underlying medical data must be scientifically valid before it can be admissible. In order to make that determination, the lawyers are entitled to discover the medical data of anonymous patients used in Dr. Campbell's study, for the purpose of preparing for the Daubert/Foret preliminary hearing. Thus, under Daubert/Foret, the medical records, which form the basis of Dr. Campbell's opinion, are discoverable.

II. Louisiana statutes and jurisprudence

A. Applicable Law
I question whether the Louisiana statutes apply in this case. Dr. Campbell is a resident of Texas; the patients are non-parties, non-residents, and non-members of the putative *653 class. Louisiana law does not control the discovery of the medical records created and maintained in Texas by a Texas doctor.

B. Right of Privacy
Every scientific medical study maintains the patient's personal anonymity. The trial court ordered the deletion of the patient's name from Dr. Campbell's medical records. The redaction of all information that might identify any patient from the records protects the patient's privacy. The removal of the patient's name eliminates the problem, meaning that production of the records does not breach the physician/patient privilege. In fact every drug company, physician, or medical publication employs redaction techniques. This procedure permits inquiry into the Daubert/Foret factors.

C. Louisiana Conflicts of Law
In 1988, Louisiana adopted a comprehensive evidence code. Chapter 7 of the Louisiana Code of Evidence, articles 701 through 706, regulates opinions and expert testimony. These articles duplicate Fed. C. E arts. 701-706. In Daubert, the court, interpreting Rule 702, set limits on the admissibility of expert scientific testimony. That rule governs the reliability of expert scientific testimony by regulating both the "subjects and theories about which an expert may testify." 113 S.Ct. at 2795. The court held that Rule 702 is the authority for a trial judge to regulate expert scientific testimony by making an initial decision about the reliability and relevance of evidence. The court recognized that Rules 702 and 703 interact, while the latter rule govern the data or facts from the particular case upon which the expert is basing his opinion and does not govern the validity of his methodology. Id., 509 U.S. 579, 113 S.Ct. at 2797-98. Rule 705 provides for disclosure of facts or data underlying expert opinion on direct or cross-examination. The Louisiana Code of Evidence and Louisiana courts have adopted these standards for admissibility of expert testimony. Adams v. Chevron, 589 So.2d 1219 (La.App. 4 Cir.1991), writ denied, 592 So.2d 415 (La. 1992); State v. Hill, 601 So.2d 684 (La.App. 2 Cir.) writ denied, 608 So.2d 192 (1992); Glankler v. Rapides Parish School Board, 610 So.2d 1020 (La.App. 3 Cir.1992), writ denied, 614 So.2d 78 (1993).
The legal conflict in this case was created by the Louisiana Legislature in 1995 when it amended La.C.C.P. art. 1469.1 and LSA-R.S. 13:3751.1, which restrict disclosure of a nonparty medical records by order, subpoena or subpoena duces tecum. The majority erroneously applies these two statutes and La. C.E. art. 510 B(1), relative to physician/patient privilege, together to suppress the discovery of Dr. Campbell's patients' medical records. I believe that the Daubert/Foret requirements, L.C.E. arts. 702, 703 and 705, and fundamental fairness all require a contrary result.
La.C.E. art. 702, and the interpretive jurisprudence, are intended to determine whether a sufficient body of reliable scientific, technical or other specialized knowledge has been developed. La.C.E. art. 703 permits an expert to base an opinion or inference on any of the following types of information: (1) first hand observation of facts, data, or opinions perceived by him before trial, (2) facts, data, or opinions presented at trial, or (3) facts, data, or opinions presented to the expert at court other than by his own direct perception. See Official Comment (d) to La.C.C.P. art. 703. However, the third category of evidence may serve as the basis for an expert's opinion only under designated circumstances "if they are of a kind reasonably relied upon by experts in the particular field in arriving at their opinion or influences." Id.
LSA-R.S. 13:3715.1 was intended to prevent litigants from subpoenaing medical records of a non-party. The policy reason for the rule was to protect the patient's privacy, prevent breach of the physician/patient privilege, and prohibit a party from impeaching a witness's credibility based on their medical history. The statute was never intended to bar the discovery of the facts or data that form the basis of an expert's opinion in a mass toxic tort case. Support for this conclusion is found in Fed. R.C.P. Rule 26(a)(2)(B), which was employed herein in the Case Management order. In notes to Rule 26, it states that "given this obligation (to disclose data and other information considered *654 by the expert), litigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinions...are privileged or otherwise protected from disclosure...." C. Wright, A. Miller, and R. Marcus, Federal Practice and Procedure §2031.1(1994).
Moreover, this case does not present a physician-patient privilege issue, as the majority holds. For one thing, the non-parties whose medical records are sought submitted themselves for empirical research so an expert could use their data to support his opinion. Given the fact that the trial court judgment goes to some pains to protect the nonparty patient's privacy interests through redaction of personal information, as well as medical information not pertinent to the expert's medical opinion, the privacy interests protected by LSA-R.S. 13:3715.1 are not impacted by the trial court's decision.
The majority's decision completely undermines the purposes of Daubert/Foret, as well as La. C.E. arts. 702, 703, and 705, all of which are designed to protect all parties. At the same time, in a mass toxic tort case, the decision does not substantially further the purposes of La.R.S. 13:3715.1, governing production of medical records. The two provisions, both have force in law in Louisiana, are obviously contradictory in this type of case. However, the majority fails to adequately justify its conclusion that their interpretation of the articles concerning production of medical records "trumps" Daubert /Foret and the code of evidence provisions allowing the production of the underlying basis of an expert's opinion. Considering the importance of this issue to all litigants in this type of case, LSA-R.S. 13:3715.1 should be strictly construed for its intended narrow legal purpose. State v. Taylor, 642 So.2d 160 (La.1994).
The majority's holding will create monstrous pretrial and trial complication for all litigants that intend to use expert scientific testimony. How a lawyer selects and handles an expert witness is a very important part of a tort case. Decisions on admissibility may and often do, determine the outcome of a trial. The issue before a judge is whether an expert is offering sufficiently reliable, trustworthy, scientific and valid evidence. The majority decision forces all litigants, in this casethe defendants, to confront medical scientific testimony from an expert witness which is based on unknown, unadmitted, and uncertain medical evidence which the defendant is prohibited from discovering. This ruling will create uncertainty and instability about scientific validity and promotes the admission of `junk science' into the case. For example, if the parties are prohibited from disclosing data components of their scientific research, there is no procedure to determine if the study is reliable or admissible. If fraud or misrepresentation is going to occur, it will most likely be found in the raw data, not in the application of the appropriate principles.
Raw data in a scientific study should be subject to whatever examination is available to ensure the quality of observation, analysis, and integrity of the observer. When this data is provided it can be compared to other data to avoid reasoning by post ergo proper hoc. It insures that the method of observation and recordation are similar. When the data or facts are known, it guarantees validation and critical evaluation permits the conclusion that the research procedures were within generally accepted principles in the scientific community.
The only alternative to obtain production of the medical records after redaction of personal information which would allow the defendant to obtain the information necessary to defend the case is acquiring the name of each patient and requesting permission from each patient to review records. Besides the fact that the alternate procedure intrudes more on the patient's privacy than the procedure sanctioned by the trial court in this case, acquiring patient names is unreasonable because of the time and costs involved. Such an alternative neither promotes judicial efficiency or provides a better solution to the very real issues raised in this case.
I agree with the trial court's finding that all medical information related to the expert's medical opinion is discoverable. The trial judge should be given the opportunity to test the validity of the parties' scientific medical *655 testimony; such a test can only be accomplished when the parties are permitted to discover the underlying data and facts. I would deny writs, allowing production of the underlying medical evidence relied upon by Dr. Campbell, as the trial court ordered. Thus, I respectfully dissent from the majority decision granting writs and reversing the trial court judgment.
NOTES
[1] This article explains in detail each of these research structures.