925 So.2d 1185 (2006)
Julia S. MOSS, Individually and on Behalf of her Deceased Husband, Michael Moss, Caitrin H. Moss and Sean M. Moss
v.
STATE of Louisiana and State of Louisiana through the Department of Transportation and Development, et al.
No. 2005-CC-1963.
Supreme Court of Louisiana.
April 4, 2006.
*1188 Charles C. Foti, Jr., Attorney General, Shows, Cali & Berthelot, E. Wade Shows, Carlos A. Romanach, Ronnie J. Berthelot, Special Assistant Attorneys General, for applicant.
Johnson, Stiltner & Rahman, Travis R. LeBleu, Baton Rouge, Thomas Law Firm, Richard S. Thomas, for respondent.
Billy Smith, in proper person.
WEIMER, Justice.
In this case the State of Louisiana through the Department of Transportation and Development ("DOTD") seeks access to a deceased non-party's medical records pursuant to the provisions of LSA-R.S. 13:3715.1. We granted certiorari to review the court of appeal's determination that the release of medical records can never be "proper" within the meaning of LSA-R.S. 13:3715.1(B)(5) if, after a contradictory hearing, it is determined that a health care provider-patient privilege exists under LSA-C.E. art. 510 and there is no applicable exception or waiver of the privilege. Finding that both lower courts erred in construing the statutory language, we reverse and remand this matter to the district court for the purpose of conducting a contradictory hearing consistent with the guidelines announced herein.

FACTS AND PROCEDURAL HISTORY
At approximately 7:00 a.m. on December 8, 1997, a vehicle being operated by Juanita Smith crossed the center line of Louisiana Highway 964 in Zachary, Louisiana, and collided head-on with a vehicle operated by Michael Moss. Both Mrs. Smith and Mr. Moss died at the scene of the accident.
On October 26, 1998, Julia Moss and her children filed a "Petition for Wrongful Death and Survival Action" against the State of Louisiana and DOTD, alleging that the accident that took the life of Mr. Moss occurred when "for some unknown reason," the vehicle being operated by Mrs. Smith crossed the center line and proceeded directly into the path of Mr. Moss, who had no opportunity to avoid the ensuing collision because of the defective condition of the roadway. DOTD answered the petition, denying liability and asserting the affirmative defense of comparative fault on the part of Mrs. Smith.
Because blood samples extracted from Mrs. Smith following the accident tested positive for the barbiturate Phenobarbital[1] *1189 and the autopsy report revealed evidence of prior brain surgery, DOTD attempted to discover information regarding Mrs. Smith's pre-accident medical condition. To that end, DOTD deposed Billy Smith, Mrs. Smith's widower and the executor of her estate. Although Mr. Smith testified that his wife took Phenobarbital for headaches brought on following brain surgery for an aneurism she suffered approximately 14 years prior to the accident, he did not know the prescribed dosage. He refused to sign a medical authorization for the release of his late wife's medical records.
DOTD filed a motion seeking an order authorizing the release of Mrs. Smith's pre-accident medical records pursuant to LSA-R.S. 13:3715.1. The motion was set for contradictory hearing. At that hearing, Mr. Smith appeared and testified to his continuing objection to a release of his late wife's medical records, expressing his belief that there had been a thorough investigation of the accident, that he and his family had been through enough, and that he did not wish to re-live the events of that horrible day. For its part, DOTD offered into evidence (among other items) the accident report, which indicated that Mrs. Smith had previously suffered a stroke and experienced blackouts; the autopsy report, which confirmed that Mrs. Smith had undergone brain surgery in the past; a scientific analysis report from the State Police Crime Lab, which revealed the presence of Phenobarbital in Mrs. Smith's blood system at the time of her death; a second scientific analysis report from the Crime Lab, which analyzed the pills found in Mrs. Smith's possession at the time of the accident, one of which contained Butalbital, another controlled dangerous substance; and the deposition of Billy Smith, which confirmed that his late wife took Phenobarbital to control the headaches she experienced as a result of brain surgery to correct an aneurism, but which indicated that he did not know the dosage. DOTD argued that because the scientific analysis report did not indicate the level of Phenobarbital in Mrs. Smith's blood stream at the time of the accident, a review of her pre-accident medical records was necessary to determine what drugs had been prescribed to Mrs. Smith, their dosage and effects, the effects of Mrs. Smith's failure to take any of her prescribed medications, and whether she had been placed under any driving restrictions by her physician.
At the conclusion of the hearing, the district court denied DOTD's motion. In doing so, the court examined the language of LSA-R.S. 13:3715.1(B)(5) and concluded that an order authorizing disclosure could issue only (1) with the consent of the patient, or (2) after a finding that the release of the information is "proper." Citing LSA-C.E. art. 510, which sets forth the health care provider-patient privilege, the court determined that none of the enumerated exceptions to the privilege, outlined in Subsection B(2) of the article, applied in this case. Acknowledging DOTD's "very valid interest in seeking these records," the district court nevertheless reasoned that release of the records would not be "proper" within the meaning of LSA-R.S. 13:3715.1(B)(5) because such a release, in the absence of an applicable exception, would contravene the general privilege set forth in LSA-C.E. art. 510. The court recognized that although the records are relevant, and may be helpful to the final determination of what really happened in this case, the disclosure of the records would bring "further hardship and remembrance" to the Smith family. Therefore, the court found no basis for authorizing release of the medical records or overcoming "the very sacrosanct privilege that exists with regard to medical records."
*1190 DOTD sought supervisory review of the district court's adverse ruling in the Court of Appeal, First Circuit which initially declined to exercise its supervisory jurisdiction, citing Herlitz Construction Company, Inc. v. Hotel Investors of New Iberia, Inc., 396 So.2d 878 (La.1981).[2]
DOTD then applied to this court for review. We granted DOTD's application and remanded the case to the court of appeal for briefing, argument, and an opinion. Moss v. State, 05-0222 (La.3/18/05), 896 So.2d 988.
In Moss v. State, Department of Transportation and Development, 04-2160 (La. App. 1 Cir. 6/24/05), 917 So.2d 45, the court of appeal denied DOTD's writ application on the merits. In reaching its decision, the court of appeal, like the district court, first determined that the information sought by DOTD was privileged under LSA-C.E. art. 510 and that none of the exceptions to the privilege set forth in Subsection B(2) of the article applied in this case. The court then turned to an examination of the provisions of LSA-R.S. 13:3715.1(B), which specify the exclusive means by which medical, hospital, or other records relating to an individual's medical treatment, history, or condition may be obtained from or disclosed by a health care provider. Because it found that LSA-R.S. 13:3715.1 "was not designed to circumvent the health care provider-patient privilege" conferred by LSA-C.E. art. 510, the court of appeal reasoned that the statute was intended to protect health care providers by providing clear ground rules for the release of medical information and by providing a procedural mechanism for a patient or his statutorily authorized representative to object to the release of information. Citing LSA-C.E. art. 510(E), which provides for only a limited waiver pursuant to LSA-R.S. 13:3715.1 when one of the Subsection B(2) exceptions applies, the court of appeal determined that discovery of a privileged communication is proper under LSA-R.S. 13:3715.1 only if there is a waiver of the privilege or if an exception to the health care provider-patient privilege exists under LSA-C.E. art. 510(B)(2). The court ultimately concluded:
DOTD seeks access to a deceased non-party's medical records pursuant to LSA-R.S. 13:3715.1. DOTD was unsuccessful in obtaining permission from an authorized person for the release of Mrs. Smith's medical records. Following a contradictory hearing, the trial court determined that the information was protected by the healthcare provider-patient privilege recognized in LSA-C.E. art. 510 and that there was no applicable exception or waiver of this privilege. A party may not obtain discovery of privileged matter. LSA-C.C.P. art. 1422. The release of the requested information can never be "proper" under LSA-R.S. 13:3715.1 B(5) if, after a contradictory hearing, it is determined that a privilege exists and there is no exception to, or waiver of, that privilege. Accordingly, we find no error in the trial court's conclusion that release of Mrs. Smith's medical records would not be "proper" under LSA-R.S. 13:3715.1 B(5).
Moss, 04-2160 at 6, 917 So.2d at 48-49.
We granted certiorari to review the correctness of the court of appeal's ruling. Moss v. State, 05-1963 (La.11/28/05), 916 So.2d 121.

LAW AND ANALYSIS
The precise issue we are called upon to resolve is whether the lower courts erred in denying DOTD's request, pursuant to LSA-R.S. 13:3715.1, for disclosure of the *1191 medical records of Mrs. Smith, a deceased non-party to the instant litigation.
As a general rule, parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. LSA-C.C.P. art. 1422. Thus, the threshold question is whether the information sought by DOTD is privileged. In this case, both the district court and the court of appeal concluded that the medical records of the late Mrs. Smith are protected by Louisiana's health care provider-patient privilege.
At the outset, we note that federal law and state law are at odds over whether there should be a general health care provider-patient privilege.[3] EDWARD J. IMWINKELRIED, THE NEW WIGMORE: A TREATISE ON EVIDENCE: EVIDENTIARY PRIVILEGES § 6.2.6 (2002). Federal courts have largely refused to recognize the privilege. Id. It does not exist at common law; rather, the privilege is purely a creation of statute. Id. The first statutory health care provider-patient privilege was adopted by the state of New York in 1828 and has since been adopted in one form or another by forty-two of the fifty states. Id.; Laburre v. East Jefferson General Hospital, 555 So.2d 1381, 1383 (La.1990).
The principal purpose of the health care provider-patient privilege is to encourage full disclosure by the patient of his or her condition in order to ensure proper diagnosis and treatment. Laburre, 555 So.2d at 1383. To obtain this end, the privilege seeks to secure the patient from disclosure, in court, of potentially humiliating, embarrassing or disgraceful information, or information that could be the basis for the patient's legal liability. Id. Another rationale for the privilege is the recognition of a patient's interest in the privacy of therapeutic matters. Id.
In Louisiana, the health care provider-patient privilege was first introduced in civil cases with the passage of 1968 La. Acts No. 499, which enacted LSA-R.S. 13:3734. Laburre, 555 So.2d at 1383; Darryl J. Foster, Comment, Competent Opinions and Privileges, 21 Loy.L.Rev. 422, 443 (1975). In 1992, with the passage of 1992 La. Acts No. 376, the Louisiana legislature enacted Chapter 5, "Testimonial Privileges," of the Code of Evidence, and in particular, Article 510, which now governs testimonial privileges, exceptions and waivers with respect to communications between a health care provider and a patient in noncriminal proceedings. LSA-R.S. 13:3734(B).
Louisiana Code of Evidence article 510 provides, in relevant part:
B. (1) General rule of privilege in civil proceedings. In a non-criminal proceeding, a patient has a privilege to refuse to disclose and to prevent another person from disclosing a confidential communication made for the purpose of advice, diagnosis or treatment of his health condition between or among himself or his representative, his health care provider, or their representatives.
The patient for whom protection was intended by this article is a person in need of medical care who might otherwise withhold relevant information for fear that it may later embarrass him or her or be used against the individual in legal proceedings. Laburre, 555 So.2d at 1383. By definition, a "confidential communication" includes medical records generated in the *1192 course of obtaining advice, diagnosis, or treatment with respect to a particular health condition. LSA-C.E. art. 510(A)(8)(b). The privilege extended by the article may be claimed by the patient or by his or her legal representative. LSA-C.E. art. 510(D). Section (B)(2) of Article 510 sets forth numerous exceptions to the privilege. However, as the lower courts correctly noted, not one of the exceptions applies to the facts of the instant case.[4] As a result, it is clear that the *1193 medical records of the late Mrs. Smith fall within the purview of the health care provider-patient privilege set forth in LSA-C.E. art. 510.
Nevertheless, the rule barring discovery of disclosures to health care providers is not a rule of incompetency of evidence, which serves the end of protecting an adverse party against unreliable or prejudicial testimony. 1 McCORMICK ON EVIDENCE § 102, p. 410 (5th ed.1999). "It is a rule of privilege protecting the extrinsic interest of the patient and designed to promote health, not truth." Id. As a privilege that benefits the patient, the privilege bestowed by LSA-C.E. art. 510 may be waived by the patient (or the individual to whom the privilege applies). Merhige v. Gubbles, 95-1106 (La.App. 4 Cir. 6/29/95), 657 So.2d 1098, 1101. This waiver may be express or implied. Succession of Smith v. Kavanaugh, Pierson & Talley, 513 So.2d 1138 (La.1987).
Conceding that Mr. Smith refused to authorize the release of his late wife's medical records and, therefore, did not expressly waive the health care provider-patient privilege, DOTD nevertheless argues that Mr. Smith impliedly waived the privilege by testifying in deposition as to the facts surrounding his late wife's medical history. According to DOTD, this partial disclosure of information regarding Mrs. Smith's medical condition waived the privilege as to all communications on the subject.
In Succession of Smith, we explained that waiver in the context of a privilege includes not merely words or conduct expressing an intention to relinquish a known right, but conduct which would make it unfair for the privilege-holder to insist on the privilege. Succession of Smith, 513 So.2d at 1143. We pointed out that the kind of unfairness which justifies a finding of waiver most commonly results from a privilege-holder's abuse of his or her privilege in three types of situations: (1) "partial disclosure," a strategic introduction into evidence at trial of only part of a larger class of privileged material; (2) "pretrial partial disclosure," a pretrial disclosure of a privileged communication indicating a decision to rely on privileged evidence at trial; and (3) "placing privileged communications at issue," an affirmative pleading of a claim or defense that inevitably requires the introduction of privileged communications. Id. at 1143-44.
In each of these three instances, the unfairness which results in a finding of waiver occurs when the privilege-holder elects to make the privileged communication an element of his or her case at trial, while attempting to maintain unfettered editorial control over the content of the available evidence. In the instant case, the privilege-holder is not a party to the proceedings. As a non-party, there is clearly no intention on the part of the privilege-holder to introduce or rely on privileged evidence at trial. There has been no attempt on the part of the privilege-holder to interject as an issue the content of any privileged communication, either by way of claim or defense. As a result, the situations discussed in Succession of Smith that traditionally support a finding of waiver simply do not apply in this case.
Moreover, Mr. Smith did not voluntarily disclose any information concerning his late wife's medical condition, but testified only as a result of his compelled attendance *1194 at a deposition at which he was not represented by counsel. See, e.g., Buffa v. Scott, 147 Ariz. 140, 708 P.2d 1331 (App. 1985) (acknowledging "weight of authority" holding that disclosures under compulsory cross-examination at a deposition are not voluntary, and thus do not constitute a waiver). His testimony at that deposition largely centered around the facts comprising Mrs. Smith's medical history; he did not disclose the contents of any privileged communications between Mrs. Smith and her treating physicians. 1 McCORMICK ON EVIDENCE § 103 at 416 (When the patient in direct testimony does not reveal any privileged matter respecting the consultation, but testifies only to his or her physical or mental condition existing at the time of the consultation without disclosure of privileged matter, there is no waiver.) See, e.g., Succession of Smith, 513 So.2d at 1149-51 (on rehearing). Considering the totality of circumstances, we do not find that Mr. Smith by virtue of his deposition testimony impliedly waived the privilege attaching to his late wife's medical records.
Having determined that Mrs. Smith's medical records are subject to the health care provider-patient privilege and that there is no exception under LSA-C.E. art. 510(B)(2) that applies in this case, and no waiver of the privilege, we consider the question of whether such otherwise privileged information may still be discoverable under the provisions of Louisiana law.
In the courts below, DOTD sought access to the pre-accident medical records of Mrs. Smith through the procedure outlined in LSA-R.S. 13:3715.1(B), which provides, in pertinent part:
The exclusive method by which medical, hospital, or other records relating to a person's medical treatment, history, or condition may be obtained or disclosed by a health care provider, shall be pursuant to and in accordance with the provisions of R.S. 40:1299.96 or Code of Evidence Article 510, or a lawful subpoena or court order obtained in the following manner:
(1) A health care provider shall disclose records of a patient who is a party to litigation pursuant to a subpoena issued in that litigation, whether for purposes of deposition or for trial and whether issued in a civil, criminal, workers' compensation, or other proceeding, but only if: the health care provider has received an affidavit of the party or the party's attorney at whose request the subpoena has been issued that attests to the fact that such subpoena is for the records of a party to the litigation and that notice of the subpoena has been mailed by registered or certified mail to the patient whose records are sought, or, if represented, to his counsel of record, at least seven days prior to the issuance of the subpoena; and the subpoena is served on the health care provider at least seven days prior to the day on which the records are to be disclosed, and the health care provider has not received a copy of a petition or motion indicating that the patient has taken legal action to restrain the release of the records. If the requesting party is the patient or, if represented, the attorney for the patient, the affidavit shall state that the patient authorizes the release of the records pursuant to subpoena. No such subpoena shall be issued by any clerk unless the required affidavit is included with the request.
....
(3) Any attorney requesting medical records of a patient who is deceased may obtain the records by subpoena, as provided in Paragraph (1) hereof, by written authorization of the person authorized under Louisiana Civil Code Article 2315.1 or the executor or administrator of the deceased's estate, or by *1195 court order, as provided in Paragraph (5) hereof.
....
(5) A court shall issue an order for the production and disclosure of a patient's records, regardless of whether the patient is a party to the litigation, only: after a contradictory hearing with the patient, or, if represented, with his counsel of record, or, if deceased, with those persons identified in Paragraph (3) hereof, and after a finding by the court that the release of the requested information is proper; or with the consent of the patient.
In the district court, and later, before the court of appeal, DOTD argued that pursuant to Section B(5) of the statute, the district court has discretion to order the release of Mrs. Smith's medical records in the absence of consent from her legal representative or an applicable exception to the health care provider-patient privilege under LSA-C.E. art. 510(B)(2), if, after a contradictory hearing, the district court determines that such disclosure is "proper." In other words, DOTD argued that LSA-R.S. 13:3715.1(B)(5) allows the district court to compel the disclosure of otherwise privileged information upon a finding that disclosure is "proper." Both lower courts disagreed.
In its analysis, the court of appeal examined the provisions of LSA-R.S. 13:3715.1 and noted that Section B(3) outlines the means by which an attorney may obtain the medical records of a deceased individual. If the decedent's estate is a party to the litigation, the decedent's medical records may be obtained by subpoena. In the alternative, written authorization for the release of the medical records may be obtained from the person authorized under LSA-C.C. art. 2315.1, or the executor or administrator of the decedent's estate. If the records cannot be obtained by subpoena or written authorization, an attorney may seek a court order pursuant to provisions of LSA-R.S. 13:3715.1(B)(5).
The court of appeal reasoned that this procedure for obtaining medical information "was not designed to circumvent the health care provider-patient privilege." Moss, 04-2160 at 5, 917 So.2d at 48. Rather, the court determined that LSA-R.S. 13:3715.1 primarily "serves as a protection to health care providers by providing clear ground rules that authorize the release of information," and also provides a procedural mechanism for a patient or his statutorily recognized representative to object to the release of information and for the judicial disposition of contested matters in this regard. Id. The court noted that the policy reasons for the rule include preventing breach of the health care provider-patient privilege and protecting the patient's privacy. Id. citing Davis v. American Home Products Corporation, 98-2160 (La.App. 4 Cir. 1/15/99), 727 So.2d 647, 653, writ denied, 99-0452 (La.4/9/99), 740 So.2d 632.
Drawing on the provisions of LSA-C.E. art. 510(E),[5] the court ultimately concluded that, in the absence of consent or waiver, discovery of a privileged communication is "proper" under LSA-R.S. 13:3715.1(B)(5), only if one of the exceptions to the health care provider-patient privilege set forth in LSA-C.E. art. 510(B)(2) exists. In other words, the court found that LSA-R.S. 13:3715.1 only establishes a procedure for *1196 the release and transfer of medical information that is not protected by a privilege.
Before this court, DOTD contends that the court of appeal's interpretation of LSA-R.S. 13:3715.1 is contrary to the express language of the statute and the rules of statutory construction. DOTD argues that the issuance of a court order for the production and disclosure of a patient's records pursuant to LSA-R.S. 13:3715.1(B)(5) is not controlled by the exceptions to the health care provider-patient privilege, and that the contradictory hearing described in that section is rendered meaningless when all discretion is removed from the district court.
In examining the merit of DOTD's argument and resolving the issue of the proper interpretation to be accorded LSA-R.S. 13:3715.1, we must keep certain principles of judicial interpretation of statutes in mind. The fundamental question in all cases of statutory interpretation is legislative intent. SWAT 24 Shreveport Bossier, Inc. v. Bond, XXXX-XXXX, p. 11 (La.6/29/01), 808 So.2d 294, 302; Succession of Boyter, 99-0761, p. 9 (La.1/7/00), 756 So.2d 1122, 1128. The rules of statutory construction are designed to ascertain and enforce the intent of the legislature. Id.; Stogner v. Stogner, 98-3044, p. 5 (La.7/7/99), 739 So.2d 762, 766.
The meaning and intent of a law is determined by considering the law in its entirety and all other laws on the same subject matter and by placing a construction on the law that is consistent with the express terms of the law and with the obvious intent of the legislature in enacting the law. SWAT 24 Shreveport Bossier, XXXX-XXXX at p. 11, 808 So.2d at 302; Succession of Boyter, 99-0761 at p. 9, 756 So.2d at 1129. A statute must be applied and interpreted in a manner that is logical and consistent with the presumed purpose and intent of the legislature. Id.
Further, it is presumed that every word, sentence, or provision in a law was intended to serve some useful purpose, that some effect is to be given to each such provision, and that no unnecessary words or provisions were employed. Sultana Corporation v. Jewelers Mutual Insurance Company, 03-0360, p. 9 (La.12/3/03), 860 So.2d 1112, 1119. As a result, courts are bound, if possible, to give effect to all parts of a statute and to construe no sentence, clause or word as meaningless and surplusage if a construction giving force to, and preserving, all words can legitimately be found. St. Martin Parish Police Jury v. Iberville Parish Police Jury, 212 La. 886, 33 So.2d 671, 676 (1947); State v. Fontenot, 112 La. 628, 36 So. 630, 634 (1904). Finally, it is presumed that the legislature acts with full knowledge of well-settled principles of statutory construction. Sultana Corporation, 03-0360 at p. 9, 860 So.2d at 1119.
In addition to the above judicial principles which are guides to determine the intent of the legislature, the legislature has enacted rules for the construction of statutes in the provisions of the revised statutes. The following are pertinent to this case.
Louisiana Revised Statutes 1:3 provides:
Words and phrases shall be read with their context and shall be construed according to the common and approved usage of the language. Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.
The word "shall" is mandatory and the word "may" is permissive.
Louisiana Revised Statutes 1:4 provides:
When the wording of a Section is clear and free of ambiguity, the letter of it *1197 shall not be disregarded under the pretext of pursuing its spirit.
Louisiana Revised Statutes 1:9 provides:
Unless it is otherwise clearly indicated by the context, whenever the term "or" is used in the Revised Statutes, it is used in the disjunctive and does not mean "and/or."
We have consistently held that the starting point in interpreting any statute is the language of the statute itself. Touchard v. Williams, 617 So.2d 885, 888 (La. 1993); Theriot v. Midland Risk Insurance Company, 95-2895 (La.5/20/97), 694 So.2d 184, 186; State v. Johnson, 03-2993 (La.10/19/04), 884 So.2d 568, 575. Applying the above rules of construction, we begin our analysis.
At issue in this case is the interpretation to be accorded LSA-R.S. 13:3715.1(B)(5), which states that "[a] court shall issue an order for the production and disclosure of a patient's records, regardless of whether the patient is a party to the litigation, only: after a contradictory hearing with the patient, or, if represented, with his counsel of record, or, if deceased, with those persons identified in Paragraph (3) hereof, and after a finding by the court that the release of the requested information is proper; or with consent of the patient."
The court of appeal examined this language and concluded therefrom that LSA-R.S. 13:3715.1 was not designed to circumvent the health care provider-patient privilege set forth in LSA-C.E. art. 510, but rather is controlled by it, and that the release of requested medical information "can never be `proper' under LSA-R.S. 13:3715.2(B)(5) if, after a contradictory hearing, it is determined that a privilege exists and there is no exception to, or waiver of, that privilege." Moss, 04-2160 at 6, 917 So.2d at 49.
An examination of the language of the statute, applying well-settled rules of statutory construction, belies this conclusion. First, there is no support in the language of LSA-R.S. 13:3715.1 for the conclusion that Section B(5) was not intended to "circumvent," or create an additional exception to, the privilege set forth in LSA-C.E. art. 510. To the contrary, LSA-R.S. 13:3715.1(B) expressly distinguishes between the methods of obtaining medical records under LSA-C.E. art. 510 and the court order contemplated by Section B(5), providing that the exclusive method by which medical records may be obtained or disclosed by a health care provider "shall be pursuant to and in accordance with the provisions of R.S. 40:1299.96[6] or Code of Evidence Article 510, or a lawful subpoena or court order obtained in the following manner." (Emphasis added.)
Secondly, the plain language of LSA-R.S. 13:3715.1(B)(5) clearly contemplates that in instances in which a non-party's medical records are being sought and the non-party or, if deceased, the non-party's representative, has not authorized the release of the medical records, there is to be a contradictory hearing and a finding by the district court that release of the requested medical information is "proper." The required contradictory hearing and determination by the district court that release is "proper" is rendered meaningless, however, under an interpretation which concludes there are only two scenarios *1198 in which the medical records of a non-party are discoverable: (1) where the non-party, or, if deceased, the non-party's representative consents to disclosure (either expressly or by waiver); and (2) where the records fall under one of the exceptions to the privilege outlined in LSA-C.E. art. 510(B)(2). In either scenario, the required contradictory hearing is rendered meaningless. If the non-party or non-party's representative consents to or authorizes release of the records, there is obviously no need for a contradictory hearing. In instances such as this one in which the non-party or non-party's representative refuses to authorize the release of medical records and not one of the statutory exceptions to the health care provider-patient privilege exists, the contradictory hearing is an empty exercise.
Had the legislature intended another interpretation, that intent would have been reflected in a different choice of words. The statute could simply have provided that a non-party's medical records are subject to release only (1) upon the non-party's authorization or consent, or (2) where one of the exceptions enumerated under LSA-C.E. art. 510(B)(2) exists. However, the statute does not so provide. Rather, LSA-R.S. 13:3715.1(B)(5) expressly requires a contradictory hearing and a finding by the court that the release is "proper." We cannot support an interpretation of this language that would render it meaningless. St. Martin Parish Police Jury, 33 So.2d at 676-677 ("We are convinced, however, that the Legislature included these words in the statute for some definite purpose, and that they cannot be declared meaningless if we can give them a reasonable interpretation.").
Finally, in examining the words of the statute, we find the legislature's choice of the word "proper" to be significant in conveying its intent. The word, defined as "[t]hat which is fit, suitable, appropriate, adapted, correct,"[7] is deliberately non-specific. It is a broad, generic term imparting some degree of discretion to the courts according to specific factual situations in a particular case. By way of example, as noted by DOTD, the legislature has incorporated the word in LSA-C.C.P. art. 2164, which provides, in pertinent part:
The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal. [Emphasis added.]
The Official Revision Comments to this article explain that "[t]he purpose of this article is to give the appellate court complete freedom to do justice on the record irrespective of whether a particular legal point or theory was made, argued, or passed on by the court below." See, Comment (a), Official Revision Comments  1960. In other words, the article extends to the courts discretion to effectuate the interests of justice in instances where an injustice would otherwise result.[8]
Because it is presumed that the legislature acts with full knowledge of all existing laws, and the well-settled rules of statutory construction, Theriot v. Midland Risk *1199 Insurance Company, 95-2895 at p. 4, 694 So.2d at 186-187, we can assume that in incorporating the word "proper" in LSA-R.S. 13:3715.1(B)(5), the legislature intended it to impart a similar meaning: the courts are vested with some discretion to evaluate, on a case by case basis and according to the particular facts presented, whether the interests of justice would be served by the release of medical records not authorized by other statutory provisions.
Therefore, contrary to the conclusion that LSA-R.S. 13:3715.1 was not intended to provide litigants a mechanism for circumventing the health care provider-patient privilege, we find precisely the opposite. We find that the most reasonable construction of the statute, giving meaning to all its provisions, is that Section B(5) confers on the court the power to compel disclosure of privileged medical information, following a contradictory hearing, if disclosure is "proper" or necessary to promote the interests of justice, even in the absence of one of the statutory exceptions enumerated in LSA-C.E. art. 510(B)(2).[9]
This construction of the statute reflects, in our opinion, a recognition on the part of the legislature that the health care provider-patient privilege, when strictly applied, without the exercise of discretion on the part of the court, can occasionally be unjust, because the effect of such a privilege is to cut off access to information and potentially the truth. United States v. Nixon, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974) ("Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed for they are in derogation of the search for the truth."). Obviously, the legislature intended the health care provider-patient privilege to be a shield and not a sword, for with the enactment of LSA-R.S. 13:3715.1 the legislature was careful to grant the court authority to order disclosure when "proper".[10]
In enacting LSA-R.S. 13:3715.1, and in particular Section B(5) thereof, the legislature has entrusted the courts with the duty of determining, in the context of a contradictory hearing, on a case by case *1200 basis, according to the unique facts presented, whether disclosure of a non-party's otherwise privileged medical information is "proper" in a particular case in the absence of consent or a waiver. This determination is not, as explained above, confined solely to ascertaining whether a statutory exception to the privilege exists.
In the instant case, both the district court and the court of appeal committed legal error by confining their determinations of whether disclosure of the late Mrs. Smith's medical records is "proper" to ascertaining whether a statutory exception to the privilege exists. In his reasons, the district court judge, although acknowledging the relevancy of the requested records and discussing the hardship that disclosure would bring to the Smith family, ultimately found that because not one of the LSA-C.E. art. 510(B)(2) exceptions to the health care provider-patient privilege exists, there is nothing that "indicates that the request is `proper' as required by the statute because it would be in violation of the privilege allowed by Code of Evidence article 510." The court of appeal reached a similar conclusion, holding: "The release of the requested information can never be `proper' under LSA-R.S. 13:3715.1(B)(5) if, after a contradictory hearing, it is determined that a privilege exists and there is no exception to, or waiver of, that privilege." Moss, 04-2160 at 6, 917 So.2d at 49. Because both lower courts applied an incorrect legal standard in assessing the merits of DOTD's motion, we find it necessary to reverse the rulings of the lower courts and remand this matter to the district court for the purpose of conducting another contradictory hearing to determine whether the release of the late Mrs. Smith's medical records is "proper" within the meaning of LSA-R.S. 13:3715.1(B)(5).[11]
Admittedly, there are no clear guidelines set forth in the statute itself for determining what is "proper" in a particular instance. See, e.g., Judge Byrnes' dissent in Goldstein v. St. Paul Fire & Marine Insurance Company, 95-2542 (La. App. 4 Cir. 12/6/95), 665 So.2d 1267, 1271, lamenting the lack of clear standards in the statute. The task left to the district court requires a balancing of competing interests. In determining whether the disclosure of otherwise privileged information is "proper," the court is required to assess whether, in a particular case, the evidentiary need for the disclosure outweighs the patient's privacy interests. See e.g., Laburre, 555 So.2d at 1384 (in which this court applied such a balancing test to conclude that the identity of blood donors should not be disclosed because the donors' privacy interests and the public's interest in maintaining an adequate blood supply outweighed the defendant's need for disclosure); Most v. Tulane Medical Center, 576 So.2d 1387 (La.1991) (in which this court employed the same balancing test to reach the opposite conclusion: that the plaintiffs' need in that case for the identity of the blood donor outweighed the donor's privacy interest and any public interest that would be served by non-disclosure).
Balancing of interests is not a unique task for the court, which engages in similar exercises in the context of determining whether otherwise relevant evidence *1201 should be excluded because its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. LSA-C.E. art. 403. The task involves recognizing and balancing competing interests: those protected by shielding the evidence sought with those advanced by disclosure.
Each case must be resolved on its own facts. Nevertheless, there are guidelines the courts should follow in assessing the propriety of disclosure in any particular case. In light of the significant policy reasons supporting the legislatively established health care provider-patient privilege and the constitutional dimensions of the privacy expectations protected thereby,[12] the burden is on the party seeking to overcome the privilege to establish the propriety of disclosure. In light of those same considerations, the privilege should not be subject to casual breach by every litigant in single-minded pursuit of the last piece of evidence which may marginally contribute to his or her case. There should be a substantial showing of relevance and need, i.e. lack of ability to obtain the evidence elsewhere, by the party seeking disclosure. Further, any exception to the privilege should be narrowly tailored and should extend only to information necessary and relevant to the condition relied on as a defense or claim. In other words, it is "proper" to disregard the privilege only to the limited extent necessary to access information which is directly related to determining the truth. Following these guidelines, the courts can insure that both the privacy interests of the patient and the due process rights of the litigant seeking disclosure are respected.
In fashioning a remedy, there are numerous tools available to the courts, including in camera inspections, excising highly personal and/or irrelevant matters, or allowing depositions limited to specific relevant questions. What is to be avoided is unbridled evaluation of one's complete medical records.

CONCLUSION
For the reasons expressed above, the decisions of the court of appeal and the district court are reversed. This matter is remanded to the district court for purposes of conducting a contradictory hearing, consistent with the guidelines announced herein, on DOTD's motion pursuant to LSA-R.S. 13:3715.1(B)(5).
REVERSED and REMANDED.
JOHNSON, J., concurs.
NOTES
[1] Phenobarbital is a Schedule IV controlled dangerous substance under LSA-R.S. 40:964. According to the testimony of DOTD's expert, while Phenobarbital was once prescribed by physicians as a sedative and to treat insomnia, today it is used primarily as a seizure medication.
[2] Moss v. State, 04-2160 (La.App. 1 Cir. 1/10/05) (unpublished).
[3] While there is disagreement as to whether courts should recognize a general health care provider-patient privilege, there is unanimity in the jurisdictions as to the existence of the narrower psychotherapist-patient privilege. EDWARD J. IMWINKELRIED, THE NEW WIGMORE: A TREATISE ON EVIDENCE: EVIDENTIARY PRIVILEGES § 6.2.7 at 502.
[4] LSA-C.E. art. 510(B)(2) provides:

Exceptions. There is no privilege under this Article in a noncriminal proceeding as to a communication:
(a) When the communication relates to the health condition of a patient who brings or asserts a personal injury claim in a judicial or worker's compensation proceeding.
(b) When the communication relates to the health condition of a deceased patient in a wrongful death, survivorship, or worker's compensation proceeding brought or asserted as a consequence of the death or injury of the deceased patient.
(c) When the communication is relevant to an issue of the health condition of the patient in any proceeding in which the patient is a party and relies upon the condition as an element of his claim or defense or, after the patient's death, in any proceeding in which a party deriving his right from the patient relies on the patient's health condition as an element of his claim or defense.
(d) When the communication relates to the health condition of a patient when the patient is a party to a proceeding for custody or visitation of a child and the condition has a substantial bearing on the fitness of the person claiming custody or visitation, or when the patient is a child who is the subject of a custody or visitation proceeding.
(e) When the communication made to the health care provider was intended to assist the patient or another person to commit or plan to commit what the patient knew or reasonably should have known to be a crime or fraud.
(f) When the communication is made in the course of an examination ordered by the court with respect to the health condition of a patient, the fact that the examination was so ordered was made known to the patient prior to the communication, and the communication concerns the particular purpose for which the examination was made, unless the court in its order directing the examination has stated otherwise.
(g)(i) When the communication is made by a patient who is the subject of an interdiction or commitment proceeding to his current health care provider when such patient has failed or refused to submit to an examination by a health care provider appointed by the court regarding issues relating to the interdiction or commitment proceeding, provided that the patient has been advised of such appointment and the consequences of not submitting to the examination.
(ii) Notwithstanding the provisions of Subitem (I) of this Item, in any commitment proceeding, the court-appointed physician may review the medical records of the patient or respondent and testify as to communications therein, but only those which are essential to determine whether the patient is dangerous to himself, dangerous to others, or unable to survive safely in freedom or protect himself from serious harm. However, such communications shall not be disclosed unless the patient was informed prior to the communication that such communications are not privileged in any subsequent commitment proceedings. The court appointed examination shall be governed by Item B(2)(f).
(h) When the communication is relevant in proceedings held by peer review committees and other disciplinary bodies to determine whether a particular health care provider has deviated from applicable professional standards.
(i) When the communication is one regarding the blood alcohol level or other test for the presence of drugs of a patient and an action for damages for injury, death, or loss has been brought against the patient.
(j) When disclosure of the communication is necessary for the defense of the health care provider in a malpractice action brought by the patient.
(k) When the communication is relevant to proceedings concerning issues of child abuse, elder abuse, or the abuse of disabled or incompetent persons.
(l) When the communication is relevant after the death of a patient, concerning the capacity of the patient to enter into the contract which is the subject matter of the litigation.
(m) When the communication is relevant in an action contesting any testament executed or claimed to have been executed by the patient now deceased.
[5] LSA-C.E. art. 510(E) provides:

Waiver. The exceptions to the privilege set forth in Paragraph B(2) shall constitute a waiver of the privilege only as to testimony at trial or to discovery of the privileged communication by one of the discovery methods authorized by Code of Civil Procedure Article 1421 et seq, or pursuant to R.S. 40:1299.96 or R.S. 13:3715.1.
[6] LSA-R.S. 40:1299.96 permits release of a patient's medical records by a health care provider upon presentation of written authorization and payment of copying and handling charges.
[7] BLACK'S LAW DICTIONARY 1216 (6th ed.1990).
[8] That the word "proper" imparts discretion, in appropriate circumstances, to effectuate the ends of justice is likewise reflected in the language of LSA-C.C.P. art. 1433, which provides, in pertinent part:

B. If the court finds that the perpetuation of testimony is proper to avoid a failure or delay of justice, it may make an order allowing the depositions to be taken.
[9] Our construction of the statute comports with that of the fourth circuit, which, although not addressing the issue directly, intimated in two decisions that the medical records of a non-party patient could be discoverable pursuant to the contradictory hearing authorized by LSA-R.S. 13:3715.1(B), even in the absence of an exception under LSA-C.E. art. 510. See, Davis v. American Home Products Corporation, 98-2160, p. 5 (La.App. 4 Cir. 1/15/99), 727 So.2d 647, 650, writ denied, 99-0452 (La.4/9/99), 740 So.2d 632 ("Absent the existence of a statutory exception, permission from the non-party patients, or a contradictory hearing, the medical records of non-party patients are not discoverable in Louisiana.") (Emphasis added.); Goldstein v. St. Paul Fire & Marine Insurance Company, 95-2542, p. 4 (La.App. 4 Cir. 12/6/95), 665 So.2d 1267, 1270, writ denied, 95-2967 (La.12/14/95), 666 So.2d 657 ("There is no question that the executor could obtain a non-party's medical records from any other health care provider under the provisions of LSA-R.S. 13:3715.1(B)(2)(a), which sets out the procedure for the release of such records.").
[10] Such a proviso is not unique to Louisiana, but has been adopted by the legislatures of North Carolina and Virginia as well.

Va.Code Ann. § 8.01-399 provides, with respect to communications between physicians and patients, that "disclosure may be ordered when a court in the exercise of sound discretion, deems it necessary to the proper administration of justice."
Likewise, N.C. Gen.Stat. § 8-53 provides that "[a]ny resident or presiding judge in the district ... may ... compel disclosure if in his opinion disclosure is necessary to a proper administration of justice."
[11] Under the present circumstances, we are constrained to remand. At oral argument, counsel for the parties indicated that discovery subsequent to the hearing pursuant to LSA-R.S. 13:3715.1 has altered the discovery landscape. As such, it would be inappropriate for this court to resolve this matter on this out-dated record.
[12] See LSA-Const. art. I, § 5.