STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT


CA 13-1043 consolidated with CA 13-1446



WESTON P. MILLER, III

VERSUS

CATHY BROUSSARD MILLER




**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 95131A
HONORABLE JOHN DAMIAN TRAHAN, DISTRICT JUDGE

**********

**ELIZABETH A. PICKETT**
**JUDGE**

**********


Court composed of Elizabeth A. Pickett, James T. Genovese, and Shannon J. Gremillion, Judges.



**AFFIRMED AS AMENDED.**



**Diane Sorola**
**Attorney at Law**
**402 W. Convent St.**
**Lafayette, LA 70501**
**(337) 234-2355**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    Weston P. Miller, III

**Gabe A. Duhon**
**James S. Broussard**
**Attorney at Law**
**P. O. Box 478**
**Abbeville, LA 70511-0478**
**(337) 893-3423**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Catherine Broussard Miller**

**PICKETT, Judge.**

Weston P. Miller, III appeals the trial court's finding of fault and subsequent award of final spousal support to his former wife, Catherine Broussard Miller, alleging error with the trial court's finding that Cathy was not at fault in the failure of the marriage and awarding her $5,350 per month in support. We affirm the trial court's finding that Cathy was not at fault in the failure of the marriage, amend the award of final spousal support to $3,350 per month, and affirm as amended.

## FACTS

Weston and Cathy had been married approximately sixteen years when they sought marriage counseling. In 2009, Cathy became suspicious that Weston was involved romantically with other women after she saw texts of a romantic nature on his phone and her son reported having seen a text, stating, "I love you" on Wes's phone from a number he did not recognize. To verify her suspicions, Cathy texted a number on Weston's phone, asking "are you alone?" The recipient responded, "I wish I could come and run into your arms right now." At that point, Cathy left home and went to her sister's home. After a few days and coaxing by Weston, she returned home.

In September or October 2010, after she and Weston reconciled, Cathy again became suspicious that he was involved with another woman. She testified that one morning, while on a golf trip with friends, Weston mistakenly sent her a text at 6:00 a.m. that read, "Good morning, Sunshine." The text referenced names that Cathy believed were the intended recipient's children's names because they were not the names of her or Weston's children. Cathy responded to the text, "You must have texted the wrong person." According to Cathy, Weston immediately called her, and she answered the call, stating: "I can't believe you're doing this again." Cathy further testified that Weston responded by apologizing, stating, "No, I'm

sorry. No, this is nothing. She's nobody." Weston claimed all the texts were business-related, but his greeting of "Sunshine" in one of the texts and the large number of texts to that number, over 3,000 in one month, caused Cathy to suspect that he was romantically involved with a woman.

After seeing another suspicious text that she believed was also from a woman and Weston refusing to tell her who sent the text, Cathy suggested counseling. Weston agreed, and they began counseling in November 2010. Cathy testified that initially after they began counseling, the texts stopped and their relationship greatly improved—for a while. She admitted, however, she had trouble accepting the fact that Weston had been texting three women for a period of time.

Cathy next related that her concerns of Weston being involved with another woman increased in February 2011 when she received a letter from a jewelry store in Baton Rouge concerning jewelry Weston had purchased. Cathy testified that when she questioned him about the jewelry, Weston explained that he bought the jewelry for her as a Christmas gift but put it aside to give to her for her birthday because she had suggested that they not exchange gifts for Christmas. He then retrieved the jewelry from his desk and gave it to her. Cathy testified that as Weston handed the jewelry to her, he stated, "maybe [it doesn't] look like you" and suggested that she exchange it. Cathy believed Weston bought the jewelry for someone else and gave it to her only because she found out about it.

Weston and Cathy were counseled by Carol Mouton, a licensed addiction counselor, who also counseled married couples. Cathy testified that not only was she concerned about Weston being unfaithful to her but also about his use of alcohol and that she hoped counseling would address both issues. On November 8,

2011, after one year of counseling, Cathy left a joint counseling session and moved out of the marital home.

On January 19, 2012, Cathy and her daughter went to look in an apartment over Weston's office for furniture that Cathy could possibly use. Cathy and her daughter testified that the bedroom was neatly arranged, and the bed was made. Cathy's daughter presented photographs she had taken that evening showing the state of the apartment. A private investigator hired by Cathy to surveil Weston testified that on the evening of January 22, 2012, he observed Weston and a female enter the apartment and remain in the apartment for more than two hours.

Weston and Shontel Cleveland testified they were at the apartment the evening of January 22, 2012, to straighten it and make it livable because Weston was moving out of the family home a few days to allow Cathy to return and remove her things from the home. They both described the bed as being unassembled that evening.

Weston filed for divorce on January 25, 2012. Cathy was awarded interim spousal support in the amount of $9,000 per month. In August 2012, Weston filed a rule to show cause why their divorce should not be granted. Shortly thereafter, Cathy filed a petition for final spousal support, asserting that she was free from fault in the failure of the marriage and in need of support. Weston answered the petition, alleging Cathy was not entitled to final spousal support because she had abandoned the marriage; engaged in cruel treatment during the marriage; and refused to engage in sexual relations with him.

Initially, after a hearing on the issue, the trial court determined that Cathy was free from fault. The parties proceeded to a Hearing Officer Conference to establish an amount of final spousal support. The Hearing Officer recommended that Weston be ordered to pay final spousal support in the amount of $3,931 per

month. Cathy appealed the recommendation, and after a hearing, the trial court awarded her $5,350 per month.

Weston appealed the trial court's judgment on fault shortly after it was rendered. He then appealed the trial court's judgment awarding Cathy final support. Because the trial court's judgment on fault was not a final appealable judgment, the appeal as to that judgment was held in abeyance until the appeal on the judgment awarding Cathy final spousal support, which Weston also appealed, was ready to be docketed. *See Ashworth v. Ashworth*, 10-215 (La.App. 3 Cir. 10/6/10), 46 So.3d 1291. We now consolidate these appeals on our own motion.

## ASSIGNMENTS OF ERRORS

Weston assigns two errors with the trial court's finding that Cathy is free from fault in the failure of the marriage:

(1)  The trial court erred in failing to consider the marriage counselor's testimony on the issue of fault.

(2)  The trial court erred in holding that Cathy was free from fault.

Weston assigns four errors with the trial court's award of $5,350 to Cathy in final spousal support:

(1)  The trial court applied the wrong legal standard for determining final spousal support.

(2)  The trial court was manifestly erroneous in applying the facts and evidence for determination of final spousal support and abused its discretion in awarding a final spousal award in the monthly amount of $5,350.

(a)  The trial court was manifestly erroneous in its refusal to consider Cathy's earning capacity and imputing income to Cathy for the purposes of calculating spousal support.

(b)  The trial court erroneously calculated the expenses of Cathy Miller for the purposes of determining final spousal support.

(c)  The trial court abused its discretion in awarding final spousal support in the amount of $5,350 based on the

allowable and proven expenses and potential income that should have been imputed to Cathy Miller.

## DISCUSSION

### *Determination of Fault*

#### *Refusal to Allow Counselor to Testify*

Weston first asserts that the trial court erred in refusing to allow Ms. Mouton to testify regarding statements made by the parties during joint counseling sessions. Specifically, he argues Cathy failed to prove that Ms. Mouton is a health care provider as defined in La.R.S. 13:3734; therefore, she did not prove the privilege protecting confidential information shared by a patient with a health care provider applies to statements she made to Ms. Mouton. Weston also asserts that Cathy waived her privilege to maintain the confidentiality of statements she made during joint counseling sessions when she testified regarding such statements at trial. He urges that this gave her an unfair advantage over him because the ruling allowed Cathy to misstate what occurred during those joint counseling sessions without him being able to impeach her testimony.

The health care provider-patient privilege, codified in La.Code Evid. art. 510(B)(1), provides:

> General rule of privilege in civil proceedings. In a non-criminal proceeding, a patient has a privilege to refuse to disclose and to prevent another person from disclosing a confidential communication made for the purpose of advice, diagnosis or treatment of his health condition between or among himself or his representative, his health care provider, or their representatives.

The primary purpose of the privilege is to encourage patients to fully disclose their problems, symptoms, concerns, and reasons for seeking treatment to allow the health care provider to make accurate diagnoses and provide proper treatment. *Moss v. State*, 05-1963 (La. 4/4/06), 925 So.2d 1185. Health care provider is defined to include "a person . . . licensed by the state . . . as a . . .

licensed professional counselor." La.R.S. 13:3734(A)(1). Ms. Mouton testified that she is a licensed addiction counselor, and Weston did not show that she is not. Accordingly, the trial court did not err in determining that statements Cathy made to Ms. Mouton in the joint counseling sessions are privileged.

Weston argues that Cathy waived the privilege that protects statements she made to Ms. Mouton during counseling. In *Succession of Smith v. Kavanaugh, Pierson & Talley*, 513 So.2d 1138 (La.1987), the supreme court addressed what constitutes a waiver of the attorney-client privilege. With regard to unfairness that can result to a client when the privilege is found to have been waived, the court determined:

> The unfairness justifying a waiver of the privilege . . . must flow from the act on which the waiver is premised, not from a vague sense that the existence of the privilege itself is inequitable. Wigmore, who supports the privilege, acknowledges, that, "Its benefits are all indirect and speculative; its obstruction is plain and concrete." 8 Wigmore, supra, § 2291, at 554. Nevertheless, the legislature in recognizing the privilege has decided that the detriment to justice from a power to shut off inquiry into pertinent facts in court will be outweighed by the benefits to the system of justice (not to the client) from a franker disclosure in the lawyer's office. McCormick, supra, § 87, at 205. *See Upjohn Co.*, 449 U.S. at 389, 101 S.Ct. at 682, 66 L.Ed.2d at 591 (1981). Consequently, a waiver must be founded on an affirmative act by the privilege-holder that creates some further detriment to the truth-seeking process in addition to that already taken into account in the creation of the privilege itself. Marcus, The Perils of Privilege: Waiver and the Litigator, 84 Mich.L.Rev. 1605, 1607 (1986).

*Id.* at 1143 (footnote omitted). Three situations have been determined to warrant the unfairness that justifies waiver. One is the abuse that results from a "partial disclosure" or "strategic introduction into evidence of only part of a larger class of privileged material." *Id.* "Disclosure at trial of only part of a larger body of privileged communications is deemed to be a waiver of privilege with respect to any withheld information about communications on the same subject matter." *Id.* at 1144. Therefore, "a privilege-holder who testifies . . . at trial about his

privileged communications with his attorney or physician, waives his right to invoke the privilege as to cross-examination or testimony of others with regard to communications on the same subject." *Id.* The court explained:

> The rationale of a waiver based on partial disclosure is that permitting a party to make such an incomplete disclosure, without losing his privilege with respect to the remainder of the communication or communications on that subject, would be unfair to the adversary because it would give the privilege-holder unchecked editorial control over the available evidence to a degree that would practically ensure a distorted presentation of the communication or communications.

*Id.*

Cathy testified that Weston stated in the November 8, 2011 joint counseling session that he did not love her, did not like her, and wanted a divorce. She denied stating that she did not love Weston, did not like him, and wanted a divorce. This is the very situation that waiver by partial disclosure is meant to avoid. Cathy's testimony regarding statements she made in the November 8, 2011 counseling session constituted a waiver of the patient health care-provider privilege, and the trial court erred in not allowing Ms. Mouton to testify.

### Fault Pursuant to Louisiana Civil Code Article 111

Cathy argues that even if the trial court erred in refusing to allow the testimony, Ms. Mouton's testimony does not affect the trial court's finding that she was not at fault in the failure of the marriage. We agree.

Louisiana Civil Code Article 111 grants a court authority to award final periodic support in a divorce proceeding or thereafter "to a party who is in need of support and who is free from fault prior to the filing of a proceeding to terminate the marriage[.]" The burden of proof is on the claimant to prove that she is free from fault. *Diggs v. Diggs*, 08-1271 (La.App. 3 Cir. 4/1/09), 6 So.3d 1030. Thus, Cathy had to prove she did not engage in misconduct that was " an independent,

contributory or proximate cause of the failure of the marriage." *Terry v. Terry*, 06-1406, p. 5 (La.App. 3 Cir. 3/28/07), 954 So.2d 790, 794. A trial court's finding of fault is subject to the manifest error standard of review. *Rusk v. Rusk*, 12-176 (La.App. 3 Cir. 6/6/12), 102 So.3d 193.

Weston argues the trial court erred in finding that Cathy was not at fault in the failure of their marriage. He first claims that Cathy abandoned the marriage. Abandonment occurs when a spouse left "the matrimonial domicile without lawful cause *and* constantly refused to return." *Ashworth v. Ashworth*, 11-1270 (La.App. 3 Cir. 3/7/12), 86 So.3d 134, 137. Cathy testified, and Weston admitted, that after she left their home on November 8, 2011, Weston never asked her to return. Thus, the second prong of a claim for abandonment is not present here, and the trial court did not err in finding that Cathy did not abandoned Weston and their marriage.

Next, Weston argues that Cathy engaged in cruel treatment that defeats her claim for final spousal support. He asserts that her statements in the November 8, 2011 session that she did not love him or like him constitute cruel treatment. Cruel treatment that defeats a claim for final spousal support is "a continued pattern of mental harassment, nagging, and griping by one spouse directed at the other, so as to make the marriage insupportable." *Rusk,* 102 So.3d at 199 (quoting *Noto v. Noto*, 09-1100, p. 7 (La.App. 5 Cir. 5/11/10), 41 So.3d 1175, 1180). "[M]ere bickering and fussing do not constitute cruel treatment" sufficient to deny a claim for final spousal support. *Id.* Moreover, cruel treatment that is "a reasonable justifiable response to the other spouse's initial acts" does not constitute legal fault. *Diggs*, 6 So.3d at 1032 (quoting *Adkins v. Adkins,* 42,076, p. 4 (La.App. 2 Cir. 4/11/07), 954 So.2d 920, 923). Thus, a woman who reasonably believes that her husband has been unfaithful will not be deprived of alimony if she engages in cruel treatment because it is natural for a spouse in that situation to become quarrelsome

or hostile. *Id.* "Such a reasonable reaction does not constitute legal fault. The suspicion of adultery causes the breakup and not the reaction." *Id*. at 1032-33.

After Weston and Cathy reconciled, Weston again engaged in the same type of behavior that caused Cathy to leave the matrimonial domicile in 2009–2010. Reconciliation extinguishes a cause of action for divorce, La.Civ.Code art. 104, and behavior that occurred before a separation and reconciliation cannot be used as the basis to obtain a divorce. *Rivette v. Rivette*, 04-1630 (La.App. 3 Cir. 4/6/05), 899 So.2d 873. Pre-separation/reconciliation behavior can be used, however, to corroborate the continuation or recurrence of similar behavior after the reconciliation. *Barnett v. Barnett*, 477 So.2d 1289 (La.App. 3 Cir. 1985). Accordingly, we find that Weston's resumption of texting and engaging in suspicious behavior as to certain texts and his questionable jewelry purchase after reconciling with Cathy justified Cathy's belief that he continued or resumed a "relationship" with a woman after the reconciliation. Importantly, the trial court found Cathy to be more credible than Weston. Though Cathy's testimony that Weston stated he did not love her and wanted a divorce in the November 8, 2011 counseling session was impeached by Weston and Ms. Mouton, the record supports the trial court's credibility assessment. For these reasons, we conclude that any cruel treatment by Cathy toward Weston after the reconciliation, including her statements that she did not love him or like him, was a reasonable reaction to his questionable behavior that caused her to suspect he was involved with another woman.

Weston also contends that Cathy refused his requests for sex. Cathy admitted that she refused to have sex with Weston but testified that she did so only when he was drunk. We find that the denial to engage in sex under such circumstances does not constitute cruel treatment. Additionally, to the extent that

Cathy may have refused Weston sex after she became suspicious he was involved with another woman, her refusals were justified. *Diggs*, 6 So.3d 1030.

***Final Spousal Support***

After the trial court held that Cathy was not at fault in the failure of the marriage, the parties proceeded to trial to determine whether she was entitled to final spousal support. At the conclusion of that trial, the trial court awarded Cathy $5,350 final spousal support for an indefinite period of time. Weston asserts that the trial court applied the wrong legal standard when determining whether Cathy is entitled to final spousal support. He further asserts that the trial court erred in applying the facts and evidence in calculating the award and also abused its discretion in calculating the award.

Appellate review of an award of final spousal support is a three-tiered process. *Baggett v. Baggett*, 96-453 (La.App. 3 Cir. 4/23/97), 693 So.2d 264. The first step of the process requires us to "determine whether the trial judge correctly applied the proper legal standard or standards." *Id*. at 266 (quoting *Davy v. Davy*, 469 So.2d 481, 482 (La.App. 3 Cir. 1985). Because this involves issues of law, we consider only whether the trial court applied the correct standards with no deference being given the trial court's determination. *Id.* Next, we review the trial court's findings of fact. *Id.* Findings of fact will not be reversed unless they are found to be manifestly erroneous in light of the entire record. *Id*. Lastly, we consider the propriety of the final spousal support award. "If it is within legal limits and based on facts supported by the record, we will not alter the amount of the award in the absence of an abuse of the trial judge's great discretion to set such awards." *Id.* at 266-67.

A spouse who was not at fault and is in need of support may be awarded final periodic support based on the needs of that party and the ability of the other

party to pay.  La.Civ.Code arts. 111, 112.  In making an award of final periodic support, "[t]he trial court shall consider all relevant factors in determining the amount and duration of final spousal support."  La.Civ.Code art. 112(B).  The factors considered may include:

(1)    The income and means of the parties, including the liquidity of such means.

(2)    The financial obligations of the parties.

(3)    The earning capacity of the parties.

(4)    The effect of custody of children upon a party's earning capacity.

(5)    The time necessary for the claimant to acquire appropriate education, training, or employment.

(6)    The health and age of the parties.

(7)    The duration of the marriage.

(8)    The tax consequences to either or both parties.

The award cannot exceed one-third of the payor spouse's net income.  La.Civ.Code art. 112(C).

Weston urges that the trial court erred in not using "need" as the basis for considering Cathy's claim for final spousal support.  Pointing to the trial court's statement that the "needs" of the former wife of a surgeon, like Cathy, may be different than those of the former wife of a school teacher, Weston asserts the trial court erroneously based Cathy's final spousal support award on the standard of living she enjoyed during their marriage.

An award for final spousal support must be "based on the needs of that party and the ability of the other party to pay."  La.Civ.Code art. 112.  Article 112 mandates that courts "shall consider all relevant factors" and enumerates more than eleven factors courts "may" consider in establishing an award.  In view of the purpose of final spousal support and the factors that may be considered in awarding such support, we cannot say that a party's needs for purposes of final

spousal support cannot be influenced by or be relative to the way he or she lived during the marriage.  In fact, Article 112 appears to contemplate this as it requires consideration of the parties' "needs" and "ability to pay" and also includes "the income and means of the parties" as factors courts may consider when awarding final spousal support.  Consideration of these factors does not equate with finding that a party entitled to a final spousal support award is entitled to an award that would allow her to maintain the lifestyle she enjoyed while married.  For these reasons, we cannot say the trial court failed to correctly apply the proper legal standard to Cathy's claim.  Moreover, as Cathy noted, the trial court's award of $5,350 in final spousal support, when compared her $9,000 interim support award, shows the trial court recognized and took into consideration the distinction between and the purpose of these two different types of support.

Weston also complains that the trial court erred when calculating its award of final spousal support because it did not consider Cathy's earning capacity.   We agree.  In May 2009, Cathy and Weston opened a business, Cathy Miller Interiors, L.L.C., in Abbeville.  The business is a retail shop that sells interior decorating accessories and decorating services provided by Cathy.  Cathy closed the store in Abbeville in March 2012 and reopened the store the following September near the upscale River Ranch Subdivision in Lafayette.  She offers the same merchandise and services at the new location.  Rent for the new location is $4,600 per month. To make the transition, Cathy used $10,000 of her own money and borrowed $100,000 from her father.

As of trial in early May 2013, the business had never made a profit.  From September 2012 until trial, the business had a gross income of $43,000.  Cathy does not draw a salary from the store.  She has one part-time employee who operates the store when Cathy has appointments with clients away from the store.

Cathy paid the rent for the Lafayette location from the store's revenue only two months. Since its inception, more than $350,000 has been invested in the business.

Weston presented expert testimony that Cathy could work as an interior decorator and earn an income of $24,000 to $50,000 per year. Specifically, the expert testified that he knew of positions Cathy was qualified to fill in Lafayette where she would earn $24,000 to $36,000 per year.

Cathy testified that she prefers to remain self-employed and operate her own design store; she is not interested in working for someone else. The trial court determined that Cathy should be given more opportunity to allow her business to succeed. While we understand that Cathy does not care to work for someone else and that the store might eventually succeed on its own, we find the trial court committed manifest error in not imputing an earning capacity to Cathy. Though financially supported by the community and Weston for more than four years, Cathy has not been successful in her business endeavor. Therefore, the evidence does not reasonably support the trial court's finding that with more time, Cathy will be able to generate sufficient income to support her business and herself. Accordingly, we impute an earning capacity of $2,000 per month to her.

Weston next argues that Cathy's alleged expenses are excessive for purposes of final spousal support. He points to this court's determination in *Launey v. Launey*, 98-849 (La.App. 3 Cir. 12/9/98), 722 So.2d 406, 408 (quoting *Widman v. Widman*, 93-613 (La.App. 3 Cir. 2/2/94), 631 So.2d 689, 691), that the only allowable expenses for purposes of permanent alimony are: "food, clothing, shelter, reasonable and necessary transportation expenses, utility expenses, medical and drug expenses, household expenses, professional dues, home and health insurance policies, telephone expenses, personal items, and income tax liability generated by alimony payments." He also notes that this court has acknowledged

that final spousal support is not meant to allow the receiving party to continue the lifestyle they had during the marriage. *Hindelang v. Hindelang*, 10-397 (La.App. 3 Cir. 11/3/10), 49 So.3d 1065, *writ denied in part and granted in part on other grounds*, 10-2701 (La. 3/4/11), 58 So.3d 464.

Weston has a monthly income of $45,000 which is used to pay only his house note, income and property taxes, and spousal support; his professional corporation pays all of his other expenses. In light of Weston's income and Cathy's itemized expenses, we decline to further reduce the trial court's award of final spousal support to Cathy for the reasons previously discussed concerning the requirements of Article 112.

## DISPOSITION

For the reasons discussed above, we affirm the trial court's finding that Cathy Broussard Miller was not at fault in the failure of the marriage, amend the trial court's award of final spousal support to Cathy Broussard Miller from $5,350 per month to $3,350 per month, and affirm the trial court's judgment as amended. Costs are assessed to Weston P. Miller, III.

**AFFIRMED AS AMENDED.**