# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 22-23

**DEREK H. TUCKER**

**VERSUS**

**RENATE TUCKER**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 97,890
HONORABLE TONY A. BENNETT, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## CHARLES G. FITZGERALD
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Billy H. Ezell, Candyce G. Perret, and Charles G. Fitzgerald, Judges.

**AMENDED IN PART;**
**AFFIRMED AS AMENDED.**

**E. Grey Burnes Talley**
**711 Washington Street**
**Alexandria, Louisiana  71301**
**(318) 442-5231**
**Counsel for Plaintiff/Appellant:**
        **Derek H. Tucker**

**Elvin C. Fontenot, Jr.**
**110 E. Texas Street**
**Leesville, Louisiana  71446**
**(337) 239-2684**
**Counsel for Defendant/Appellee:**
        **Renate Tucker**

**FITZGERALD, Judge.**

In the matter before us, Derek H. Tucker appeals the trial court's award of final periodic spousal support to Renate Tucker.

## FACTS AND PROCEDURAL HISTORY

Derek and Renate were married in April 1994. They are the parents of two adult children. In January 2016, the parties physically separated when Derek moved out of the marital home.

Many years later, in August 2019, Derek filed a petition for divorce. In answering the petition, Renate asserted claims for both interim spousal support and final spousal support. The parties were ultimately divorced by judgment dated July 28, 2020. The divorce judgment included an award of interim spousal support in the amount of $1,900.00 per month.

Thereafter, on June 14, 2021, Renate filed a rule for final spousal support.[1] The hearing on final periodic support was held on October 18, 2021. At the close of evidence, the trial court found that Renate was free from fault in the dissolution of the marriage; the trial court then ordered Derek to pay Renate final periodic spousal support in the amount of $1,700.00 per month. This ruling was reduced to a written final judgment signed on October 22, 2021. Derek appeals this judgment.

On appeal, Derek asserts eight assignments of error:

1. It was error for the Trial Court to find Renate free from legal fault that caused the breakup of the marriage.

2. It was error for the Trial Court to base its fault finding on Derek's moving out of the former matrimonial domicile to stay with the person he later married.

---

[1] The rule for final periodic support is duplicative because Renate's answer of December 17, 2019, asserted the same cause of action.

3. It was error for the trial court to not impute earned income to Renate[] when she failed to prove her physical disability to work.

4. It was error for the trial court to not impute unearned income to Renate[] when she failed to seek Social Security disability benefits.

5. It was error for the trial court to not impute unearned income to Renate[] when she failed to seek unemployment benefits.

6. It was error for the trial court to not impute earned income to Renate[] when she failed to seek any employment.

7. It was error for the Trial Court to award Renate final periodic support in the amount of $1,700 [per] month[] when she failed to prove monthly expenses in that amount.

8. It was error for the Trial Court to impute $6,055.42 net monthly income to Derek and to award final periodic support in the amount of $1,700.00 [per] month[] when his net monthly income was $4,258.26.

## LAW AND ANALYSIS

Louisiana Civil Code Articles 111 and 112 provide for final periodic spousal support. Under these articles, a trial court must make three findings of fact before awarding this type of support. First, whether the claimant spouse is free from fault in the dissolution of the marriage. Second, whether the claimant spouse has a legal need for final periodic support. And third, whether the payor spouse has the ability to pay final periodic support.

## I. Legal "Fault" Precluding Final Periodic Spousal Support

Derek's first two assignments of error challenge the trial court's finding that Renate was free from fault in the dissolution of the parties' marriage.

Louisiana Civil Code Article 111 states: "In a proceeding for divorce or thereafter, the court . . . may award final periodic support to a party who is in need of support and who is free from fault prior to the filing of a proceeding to terminate the marriage in accordance with the following Articles."

2

Louisiana Civil Code Article 112(A) then reiterates the requirement that the claimant spouse be without legal fault, stating: "When a spouse has not been at fault prior to the filing of a petition for divorce and is in need of support, based on the needs of that party and the ability of the other party to pay, that spouse may be awarded final periodic support[.]"

Renate, as the party seeking final spousal support, had the initial burden of affirmatively proving that she was free from fault prior to the filing of Derek's petition for divorce. This is a question of fact. *Pearce v. Pearce*, 348 So.2d 75 (La.1977). We therefore review Derek's first assignment of error—whether the trial court erred in finding Renate free of legal fault—under the manifest error standard of review. *Id*.

*A. What is Legal Fault?*

In *Adams v. Adams*, 389 So.2d 381 (La.1980), the Louisiana Supreme Court explained that "fault" for purposes of barring alimony (now final periodic spousal support) is synonymous with the fault grounds for separation and divorce under La.Civ.Code arts. 138 and 139 (1870). The fault grounds of former Articles 138 and 139 consist of adultery; conviction of a felony and sentence to death or imprisonment with hard labor; habitual intemperance, excesses, cruel treatment, or outrages if such is of such a nature to render their living together insupportable; public defamation; abandonment; an attempt by one on the life of another; being charged with a felony and fleeing from justice; and intentional non-support.

In our case, cruel treatment is the fault ground of interest. Cruel treatment was also at issue in *Adams*. And in that context, the supreme court explained:

> [T]he word "fault" contemplates conduct or substantial acts of commission or omission by the wife violative of her marital duties and responsibilities. A wife is not

3

> deprived of alimony after divorce simply because she was not totally blameless in marital discord. To constitute fault, a wife's misconduct must not only be of a serious nature but must also be an independent contributory or proximate cause of the separation.

*Id.* at 382-83 (quoting *Pearce*, 348 So.2d at 77 (citations omitted)).

In reversing both lower courts, the *Adams* court determined that mere accusations by the wife of an illicit affair between her husband and another woman, and unintrusive rides by the wife past her husband's workplace did not constitute acts of such a severe nature as to render their living together insupportable. *Id.*

The fault ground of cruelty was next before the supreme court in *Brewer v. Brewer*, 94-1090 (La. 12/12/94), 573 So.2d 467. There, the court explained:

> [T]he trial court apparently equated fault in a generic sense, i.e., imperfection, with legal fault in finding Theresa at fault in the separation. In this imperfect world, all spouses have faults, and a spouse need not be perfect to be free from legal fault.
>
> To be legally at fault, a spouse must be guilty of cruel treatment or excesses which compel a separation because the marriage is insupportable. . . .
>
> While the conclusions of the trial court are accorded much deference in this type of case, here there is clear and obvious error in equating "nagging" with legal fault. The error, if not corrected, would result in both a misapplication of Civil Code article 138 and an egregious miscarriage of justice.

*Id.* at 469 (citations omitted).

In *Allen v. Allen*, 648 So.2d 359 (La.1994), the supreme court again addressed cruel treatment. In reversing both lower courts, the supreme court stated as follows:

> The trial court decided that Mildred Allen's complaints and criticisms constituted legal fault. Isolated instances of arguing, complaining and criticizing are an unfortunate concomitant of almost all marriages, and they do not generally arise in a vacuum. *Brewer v. Brewer* decided that a wife's nagging does not constitute legal fault. Differences of opinion arise in most marriages, and these disagreements cannot be characterized as legal fault.

. . . .

> Charles Harold Allen was undoubtedly disappointed in his marriage. He undertook that contract with a relatively young, healthy, working woman. She soon became ill and incapable of holding a job. The medical evidence of her disability was unrebutted. Unhappy with his bargain, Charles Harold Allen exercised his right to leave his wife and obtain a divorce.

> The problem is the future support of his former wife, who is now eight years older, sick and disabled. She has no assets and no earning capacity. There is no evidence that she breached her marital contract in any significant way. . . .

> The trial court was clearly wrong in finding that Mildred Allen's remarks, criticisms and complaints constituted legal fault.

>> [T]he trial court apparently equated fault in a generic sense, i.e., imperfection, with legal fault in finding [the wife] at fault in the separation. In this imperfect world, all spouses have faults and a spouse need not be perfect to be free from legal fault. *Brewer v. Brewer*, 573 So.2d at 469.

> The trial court and court of appeal erred as a matter of law in finding Mildred Allen guilty of legal fault which caused the dissolution of the marriage. As in most sundered marriages, the parties became dissatisfied.

*Allen*, 648 So. 2d at 363 (second alteration in original).

### B. Fault Evidence Adduced at Trial

At trial, Renate testified that she was a loving and faithful wife to her husband during their twenty-seven-year marriage, that she cooked his meals, that she washed his clothes, that she assisted him in any way she could, that she cared for their children, and that she was devastated when he moved out of the marital domicile. At this point, Renate established a prima facie case that she was free from fault, and the burden of persuasion shifted to Derek to put on countervailing evidence. Derek attempted to do this by showing that Renate was guilty of cruel treatment.

To this end, Derek asserts that Renate is guilty of cruel treatment for refusing to have sex with him. Derek testified that by 1998 (four years into their marriage),

5

Renate would only have sex with him once a year. Because of this, he moved into a spare bedroom in 2003, and he and Renate never had sexual relations again. As Derek put it, "When it got down to once a year, it was like, wow. And I wasn't gonna beg, you know. I shouldn't have to."

Renate, on the other hand, testified that she never refused Derek's sexual advances. In fact, she pointed out that Derek was the one who stopped being intimate. As she explained, "my husband stopped being intimate with me. He did not want to have anything—any love or any, you [k]now, passion with me." Renate further explained that in 2001, Derek admitted to having an adulterous relationship with another woman.

"The courts in this state have recognized that the persistent and unjustified refusal to engage in sexual relations, in the absence of consent, sickness, or grave fault may constitute cruel treatment within the purview of LSA C.C. Art. 138." *Nowlin v. Nowlin*, 482 So.2d 882, 885-86 (La.App. 2 Cir. 1986). "[T]he persistent denial of sexual intercourse must be unreasonable and unjustified." *Dean v. Dean*, 579 So.2d 1124, 1129 (La.App. 2 Cir.), *writ denied*, 584 So.2d 683 (La.1991). "The party that alleges the refusal of sexual intercourse has the burden to show that there was persistent and unjustified refusal." *Id*.

The record here reflects that the absence of sexual relations was caused by mutual abstention. And Derek, as the party seeking to prove Renate's fault on this basis, failed to present any evidence of Renate's persistent and unjustified refusal to engage in sexual intercourse.

Derek next argues that Renate frequently visited internet dating sites in 2003. Renate, in turn, denied this at trial. Derek then introduced eleven emails from May 31, 2003, and four more from June 2, 2003. These emails consist of back-and-forth

conversations between Renate and another person. Derek contends that the emails prove that Renate met someone online and then began an inappropriate relationship with that person. Renate denied all of this, explaining that she and her email correspondent were merely friends. In the end, Derek conceded that he was "not aware if she was dating or anything."

But more significantly, Derek admitted that he did not discover these emails until approximately six weeks before trial. As noted above, trial was held on October 18, 2021, more than one year after entry of the divorce judgment and more than five years after the parties had physically separated.

A similar situation was presented in *Vermaelen v. Vermaelen*, 17-665 (La.App. 3 Cir. 3/14/18), 240 So.3d 1004. There, Mr. Vermaelen argued that his wife was at fault for unauthorized financial transactions. But this argument was rejected because he did not learn of these transactions until after he had filed for divorce. Likewise, in *Henry v. Henry*, 08-692 (La.App. 3 Cir. 12/10/08), 999 So.2d 255, Mr. Henry asserted that the trial court erred in finding that his wife's gambling did not amount to fault. But there, too, Mr. Henry admitted that he did not discover this until after they had physically separated.

Put simply, Derek left the marital residence in January 2016. And because Derek did not know about the emails until 2021, Renate's actions cannot be viewed as fault for purposes of precluding final spousal support: her actions did not render their living together insupportable.

Derek points to many other instances of Renate's alleged cruel treatment. For example, Derek testified that Renate never deposited any of her earnings into their joint account. He explained that she secreted her income rather than using it to pay for family expenses. Derek submits that this was cruel conduct. Yet Derek admitted

7

at trial that Renate was the sole breadwinner when they first married, and that they lived in Renate's separate-property residence from 1994 until he (Derek) moved out in 2016. In addition, Renate testified that she suffered a work-related injury in 2013, rendering her totally disabled since that time.

Derek next asserts that in late 2015, Renate unilaterally decided that she wanted to purchase a new home. Derek testified that he was never interested in buying this home. Renate, on the other hand, testified that they both wanted the house, but Derek never followed through with the purchase. On appeal, Derek contends that all of this was cruel: it caused him unnecessary stress and hastened the demise of their marriage.

Derek also points to Renate's 2004 trip to New Orleans. Specifically, Derek testified that Renate went on a bus trip from Fort Polk to New Orleans in 2004, and that she did not return with the other passengers. According to Derek, she finally called three days later; he then had to go pick her up in Lake Charles; and after all that, she refused to tell him what had happened. Derek submits that this constitutes fault.

Finally, Derek asserts that Renate improperly involved their children in adult matters. In support, Derek points to Renate's testimony. Specifically, Renate testified that Derek frequently stayed out all night. According to Renate, Derek would come home after work to eat supper, followed by a quick shower, and then he was off, claiming he was needed at the American Legion to assist with bingo. Renate was suspicious of this explanation. So, she would often drive by the American Legion with her daughters to see if she could find him. On appeal, Derek contends that "[t]his action has to have been detrimental to the children, poisoning

their minds against their father." Derek submits that this also amounts to cruel conduct.

Interestingly, when Derek was asked why he moved out of the family home in January 2016, he responded as follows:

> Well, I'd been thinking about it. I was trying to make it to my daughter's 18th birthday. Uh, it was right around Christmastime. I cooked the Christmas meal and nobody would help me with it. . . . [Renate] had—at the same time, she was talking about the new house and all that. I knew we were going nowhere and on the night before, on New Year's Eve [2015], I was home alone. Her and the children had left to go down to the casino. Uh, I was sitting there alone. I wasn't drinking or anything and I was doing some reflecting and I went to a very dark place. Uh, I did not want to end up like that so I made the decision right there, I'm gonna change and get out of the misery I was in.

Two weeks later, Derek left the family home and moved in with another woman whom he eventually married. He gave no warning to Renate that he was leaving. He just started packing his things and told her that he was leaving, and that he was going to live with someone else. Renate testified that she was shocked and devastated. She thought their relationship was getting better because they were planning on purchasing a new home.

In making its fault determination, the trial court noted that it had listened to the parties' testimony and that the truth was likely "somewhere in the middle." The court then stated that "[t]he most compelling testimony is the admission from Mr. Tucker that after all these years of being in this dark place[,] he decided to move out to stay with the person that he would ultimately marry."

In the end, the trial court found that Renate was free from fault in the dissolution of the parties' marriage. This finding of fact is reasonably supported by the record. Thus, Derek's first assignment of error is without merit.

9

Now to Derek's second assignment of error: whether "[i]t was error for the Trial Court to base its fault finding on Derek's moving out of the former matrimonial domicile to stay with the person he later married." In support, Derek argues that his fault is irrelevant, and that it was error for the trial court to base its ultimate fault finding on his conduct. This assignment challenges the trial court's interpretation and application of La.Civ.Code arts. 111 and 112, specifically the "fault" language in those articles.

So is Derek's misbehavior irrelevant? Of course not. For example, in *Harmon v. Harmon*, 12-580 (La.App. 3 Cir. 11/7/12), 101 So.3d 1122, this court affirmed the trial court's finding that Ms. Harmon was free from fault, specifically noting that her hostility towards her husband was a justifiable response to his adultery and pornography. And in *Miller v. Miller*, 13-1043, pp. 8-9 (La.App. 3 Cir. 4/2/14), 161 So.3d 690, 696, *writ denied*, 14-1607 (La. 10/31/14), 152 So.3d 154 (citation omitted; quoting *Diggs v. Diggs*, 08-1271, p. 3 (La.App. 3 Cir. 4/1/09), 6 So.3d 1030, 1032-33), we explained that

> a woman who reasonably believes that her husband has been unfaithful will not be deprived of alimony if she engages in cruel treatment because it is natural for a spouse in that situation to become quarrelsome or hostile. "Such a reasonable reaction does not constitute legal fault. The suspicion of adultery causes the breakup and not the reaction."

In sum, the record here reflects that the trial court properly admitted evidence of Derek's misbehavior and then correctly weighed this evidence in finding that Renate was free from fault. Hence, the trial court did not err in its interpretation or application of La.Civ.Code arts. 111 and 112. Derek's second assignment of error is also without merit.

10

## II.    Renate's Legal "Need" for Final Periodic Support

Assignments of error three through seven challenge the trial court's finding that Renate established a legal "need" for final spousal support. These assignments are addressed below.

At trial, Renate had the burden of proving her need for final periodic spousal support. *McMullen v. McMullen*, 11-220 (La.App. 5 Cir. 12/13/11), 82 So.3d 418. This is a question of fact, and a trial court's findings of fact are reviewed on appeal under the manifest error standard of review. *Stobart v. State through Dep't of Transp. & Dev.*, 617 So.2d 880 (La.1993).

### A.    "In Need of Support" Equates to "Necessitous Circumstances"

Louisiana Civil Code Article 111 (emphasis added) provides that the court "may award final periodic support to a party who is *in need of support* and who is free from fault . . . in accordance with the following Articles."

Louisiana Civil Code Article 112 (emphasis added) then states:

> A. When a spouse has not been at fault prior to the filing of a petition for divorce and is *in need of support*, based on the needs of that party and the ability of the other party to pay, that spouse may be awarded final periodic support in accordance with Paragraph B of this Article.
>
> B. The court shall consider all relevant factors in determining the amount and duration of final support, including:
>
> > (1) The income and means of the parties, including the liquidity of such means.
> >
> > (2) The financial obligations of the parties, including any interim allowance or final child support obligation.
> >
> > (3) The earning capacity of the parties.
> >
> > (4) The effect of custody of children upon a party's earning capacity.
> >
> > (5) The time necessary for the claimant to acquire appropriate education, training, or employment.
> >
> > (6) The health and age of the parties.

(7) The duration of the marriage.

(8) The tax consequences to either or both parties.

(9) The existence, effect, and duration of any act of domestic abuse committed by the other spouse upon the claimant or a child of one of the spouses, regardless of whether the other spouse was prosecuted for the act of domestic violence.

"Although the [above] articles do not define 'in need of support,' the jurisprudence has equated it with insufficient means of support or necessitous circumstances." *Fontana v. Fontana*, 13-916, pp. 10-11 (La.App. 4 Cir. 2/12/14), 136 So.3d 173, 181. "Means, in this context, has been defined as including not only the income but also the assets of the claimant spouse." *Id.* "The claimant spouse has the burden of proving he or she has insufficient means of support or is in necessitous circumstances." *Id.* "Support," in this context, connotes an amount sufficient for the claimant spouse's maintenance, which includes expenses for food, shelter, clothing, reasonable and necessary transportation expenses, medical and drug expenses, and the income tax liability generated by the support payments. *Loyacano v. Loyacano*, 358 So.2d 304 (La.1978), *vacated on other grounds, sub nom. Loyacano v. LeBlanc*, 440 U.S. 952, 99 S.Ct. 1488 (1979), *reinstated*, 375 So.2d 1314 (La.1979).

Similarly, in *Bernhardt v. Bernhardt*, 283 So.2d 226, 229 (La.1973) (emphasis in original), the supreme court explained that "the term 'maintenance', while meaning *primarily* food, clothing and shelter, does include such items as reasonable and necessary transportation or automobile expenses, medical and drug expenses, utilities, household expenses, and the income tax liability generated by the alimony payments made to the former wife."[2]

---

[2] This court has consistently defined "maintenance" as expenses for food, shelter, clothing, reasonable and necessary transportation expenses, medical and drug expenses, utilities, household expenses, and the income tax liability generated by the support payments. *Price v. Price*, 17-1180 (La.App. 3 Cir. 5/2/18) (unpublished opinion), *writ denied*, 18-913 (La. 9/28/18), 252 So.3d 930; *Hindelang v. Hindelang*, 10-397 (La.App. 3 Cir. 11/3/10), 49 So.3d 1065, *writ denied in part and*

In summary, we hold that the "in need of support" language of La.Civ.Code arts. 111 and 112 equates to "necessitous circumstances." And "necessitous circumstances" is synonymous with insufficient means for "maintenance." Thus, final periodic support is awarded to a former spouse in need and is limited to an amount sufficient for maintenance as opposed to continuing an accustomed style of living. Maintenance includes expenses for food, shelter, clothing, reasonable and necessary transportation or automobile expenses, medical and drug expenses, utilities, household expenses, and the income tax liability generated by the payments of final periodic support to the former wife.

### B. Renate's Disability and Means

In Derek's third, fourth, fifth, and sixth assignments of error, he asserts that the trial court erred in not imputing any income to Renate because she failed to prove her inability to work, failed to seek social security disability benefits, failed to seek unemployment benefits, and failed to seek employment.

At trial, Renate testified at length concerning her health, claiming that she is totally disabled and therefore unemployable. According to Renate, she sustained injuries to her knees and right ankle when she fell in her classroom while working in a daycare facility in 2013. She stated that she received workers' compensation for a while but that she no longer was collecting those benefits. She further stated

---

*granted in part on other grounds*, 10-2701 (La. 3/4/11), 58 So.3d 464; *Goodnight v. Goodnight*, 98-1892 (La.App. 3 Cir. 5/5/99), 735 So.2d 809; *Launey v. Launey*, 98-849 (La.App. 3 Cir. 12/9/98), 722 So.2d 406; *Glaude v. Glaude*, 97-1343 (La.App. 3 Cir. 6/24/98), 715 So.2d 682; *Widman v. Widman*, 93-613 (La.App. 3 Cir. 2/2/94), 631 So.2d 689; *Vernotzy v. Vernotzy*, 591 So.2d 1293 (La.App. 3 Cir. 1991); *Guillory v. Guillory*, 490 So.2d 758 (La.App. 3 Cir. 1986); *Aucoin v. Aucoin*, 488 So. 2d 366 (La.App. 3 Cir. 1986); *Lopez v. Breaux*, 462 So.2d 1333 (La.App. 3 Cir. 1985); *Laporte v. Howell*, 452 So.2d 420 (La.App. 3 Cir. 1984); *Lamb v. Lamb*, 461 So.2d 531 (La.App. 3 Cir. 1984), *writ denied*, 464 So.2d 1381 (La.1985); *Freet v. Freet*, 442 So.2d 1366 (La.App. 3 Cir. 1983); *Buxton v. Buxton*, 411 So.2d 1273 (La.App. 3 Cir. 1982); *Silas v. Silas*, 399 So.2d 779 (La.App. 3 Cir.), *writ denied*, 404 So.2d 278 (La.1981); *Moss v. Moss*, 379 So.2d 1206 (La.App. 3 Cir. 1980).

that she underwent a failed nerve block in 2020. She added that she needed "dual replacement" but was unable to undergo those surgeries because of a blood clot. She also noted that her treating physician is in Baton Rouge. As to her physical limitations, Renate explained that she can barely walk and must use a walker to get around; she "can't do activities at [her] own home"; she cannot put on her own clothes; she cannot lift her legs; and she cannot drive.

Derek, on the other hand, testified that during the last three years before he left the marital home, Renate never needed a walker, crutches, or a wheelchair to get around the house. He added that Renate was able to dress herself and to drive during those years.

Derek contends on appeal that the trial court erred in finding that Renate was totally disabled. He submits that unlike the wife in *Rusk v. Rusk*, 12-176 (La.App. 3 Cir. 6/6/12), 102 So.3d 193, who called three lay witness to support her claim of disability due to fibromyalgia, cervical spondylosis, and depression, Renate failed to call a single witness or doctor to support her claim of disability.

Derek further submits that unlike the wife in *Smith v. Smith*, 08-575, p. 18 (La.App. 5 Cir. 1/12/10), 31 So.3d 453, 464, who introduced medical records to show that "she suffer[ed] from lupus, Sjögren's syndrome, mixed connective tissue disease, polymyositis, dermatomyositis, and diffuse scleroderma," Renate failed to introduce any medical records or any other corroborating evidence of her alleged disability. Derek believes that Renate is able to perform some type of work, and at the very least, sedentary work from home.

This court was presented with a similar issue in *Rusk*, 102 So.3d 193. There, we explained:

14

> A spouse claiming the inability to work for the purpose of computing alimony bears the burden of proving that disability by a preponderance of the evidence. It is axiomatic that a person's own self-serving testimony regarding his or her inability to work is insufficient proof of the inability. In a situation such as the one presented by the instant case, the spouse claiming such an inability to work must present some type of corroborating evidence of the claimed disability, such as doctor's reports or testimony. Except perhaps in a case where the spouse's obvious mental or physical disability renders that spouse impaired, a trial court abuses its discretion in finding that a spouse is unable to work on the basis of that spouse's own self-serving testimony alone.

*Id.* at 200-01 (quoting *Williams v. Williams*, 97-2245, p. 7 (La.App. 4 Cir. 4/11/01), 803 So.2d 50, 54). Notwithstanding the reference to abuse of discretion, the standard of review employed in *Rusk* was manifest error.

In this case, the trial court acknowledged that Renate "testified she is totally disabled, although that is the only evidence regarding that." Based on Renate's testimony alone, the trial court found that Renate was disabled and could not work. However, we agree with *Rusk*: Renate's testimony alone is insufficient to prove her inability to work. The trial court thus manifestly erred in this respect.

"If a non-working spouse claiming alimony fails to meet the burden of proof relating to his or her inability to work, the trial court deciding an alimony dispute must impute some income to that spouse." *Williams*, 803 So.2d at 54. Here, the trial court did not reach this issue because of its earlier finding that Renate was disabled. And because this earlier finding impeded the trial court's fact-finding function as to Renate's earning capacity under La.Civ.Code art. 112(B)(3), we now review the record de novo to decide the amount of income to attribute to Renate. *Prejean v. Rabalais*, 08-436 (La.App. 3 Cir. 12/10/08), 998 So.2d 1225.

15

To this end, Derek suggests that Renate should be imputed minimum wage at thirty-two hours per week. When he was asked about Renate's employment history, he recalled that "she had worked in the school system in Vernon Parish Schools. I know she did cafeteria work and some substitution years before that. But when she was working there, she was working at the Child and Youth Services . . . . [I]t wasn't a school, it was basically a daycare." Renate's testimony was essentially the same. But Renate added that she has no means of support: she has not worked since 2013, she does not receive disability or unemployment benefits, and she owns no assets other than her home. While Renate's physical health is addressed above, the record is silent as to her age and educational history.

In the end, we agree with Derek that the appropriate income to impute to Renate is minimum wage at thirty-two hours per week, which equates to $1,005.33 per month.

In summary, the trial court clearly erred in finding that Renate is unable to work; and on review, we find that Renate has an earning capacity of $1,005.33 per month, and we have imputed income to her in that amount. And because we have imputed income to Renate, Derek's fourth, fifth, and sixth assignments of error are now moot.

### C. Expenses for Renate's Maintenance

In his seventh assignment of error, Derek argues that the trial court erred in awarding Renate final periodic support of $1,700.00 per month because she failed to prove monthly expenses in that amount. As noted above, Renate had the burden of affirmatively proving her need for support. This is a question of fact. And the trial court's findings of fact are reviewed on appeal under the manifest error standard of review.

The trial court addressed Renate's monthly expenses in its oral reasons for judgment, stating only as follows:

> In looking at the Code and cases regarding the amount for periodic support, the law is that it cannot be more than one-third of the net pay. The case law states it is to be an amount sufficient to maintenance as opposed to continuing an accustomed style of living. . . . [Derek] is married, although his present wife owned the home before he married her. So, some of the expenses stated by him, um, are joint expenses. I will state that [Renate] also has her adult daughter living with her, who is not paying much, if anything, regarding the bills of [Renate]. Therefore, I have reduced some of the expenses listed by [Renate]. It is also my belief, that with an adult child living in the home rent free, the laundry and lawn care, uh, can and should be accomplished by that person. The Court will also note that the interim spousal support was set at $1900 per month. After the calculations, I find that Ms. Tucker is free from legal fault, and I'm gonna set the periodic support at $1,700 per month.

Significantly, the trial court made no express, specific factual findings as to which of Renate's monthly expenses were necessary for her maintenance. Some of the expenses were reduced, but these expenses were never identified. Other expenses appear to have been excluded, such as "laundry and lawn care," but this is also unclear. All of this makes reliance on the manifest error rule impossible.

This dilemma was addressed in *Guist v. I-49 Truck Plaza*, 539 So.2d 1255 (La.App. 3 Cir.), *writ denied*, 543 So.2d 20 (La.1989). There, this court explained that "[w]hen a Trial Court fails to make findings of fact, the reviewing Court must view the evidence in the light most favorable to the appellees and in support of the judgment." *Id*. at 1257.

To this end, Renate contends that her monthly expenses total $3,936.85. In support, she introduced into evidence an affidavit of income and expenses. She also testified about most of the expenses listed in her affidavit. But final periodic spousal support is limited to an amount sufficient for maintenance as opposed to continuing an accustomed style of living. Thus, the following expenses listed by Renate are not

17

appropriate: lawn care ($250); computer ($89); cellular phone ($222); laundry and cleaning ($175); birthdays ($60); holiday expenses ($125); entertainment ($110); meals away from home ($125); movies ($50); and pet expenses for food, veterinarian care, and grooming ($200). And based on the record evidence, the expenses for automobile maintenance ($125) and automobile repairs ($110) are also inappropriate.

In sum, we find that the reasonable and allowable expenses for Renate's maintenance total $2,295.85 per month. And because we imputed income to Renate in the amount of $1,005.33, we further find that Renate is in need of final periodic spousal support in the amount of $1,290.52 per month.

## III. Award in Excess of One-Third of Derek's Net Income

In Derek's eighth and final assignment of error, he contends that the trial court's support award of $1,700.00 per month exceeds one-third of his net income. In support, he cites La.Civ.Code art. 112(D) ("The sum awarded under this Article shall not exceed one-third of the obligor's net income."). According to Derek, his net monthly income is $4,258.26, not $6,055.42 as calculated by the trial court. However, for the reasons below, this assignment is now moot.

Importantly, Derek does not assign as error his inability to pay the support amount awarded by the trial court: $1,700.00 per month. He asserts instead that this amount exceeds one-third of his net income under La.Civ.Code art. 112(D). However, we have determined on review that Renate's legal need for final periodic support is $1,290.52 per month, and this amount does not exceed one-third of Derek's stated net income of $4,258.26 per month.

18

Put simply, because Renate is in need of support in the amount of $1,290.52 per month, and because Derek has the ability to pay this sum, we amend the amount of final periodic spousal support from $1,700.00 per month to $1,290.52 per month.

**DECREE**

For the above reasons, we amend the trial court's judgment to order Derek H. Tucker to pay the sum of $1,290.52 per month to Renate Tucker in final periodic spousal support. The judgment is affirmed in all other respects, including the trial court's finding that Renate Tucker is free from fault in the dissolution of the marriage. The costs of this appeal are assessed to the parties in the following percentages: Derek H. Tucker, 83%; Renate Tucker, 17%.

**AMENDED IN PART; AFFIRMED AS AMENDED.**